**In re John Wali MUSTAFA II, Applicant.**

**An Applicant for Admission to the Bar of the District of Columbia Court of Appeals.**

**No. 93–SP–134.**

District of Columbia Court of Appeals.

Submitted April 23, 1993.
Decided Sept. 16, 1993.

Catherine B. Kelly, Chairperson, submitted a report on behalf of the District of Columbia Committee on Admissions.

---

Mark W. Foster, Washington, DC, submitted a brief for applicant.

Before KING and SULLIVAN, Associate Judges, and BELSON, Senior Judge.

SULLIVAN, Associate Judge:

John W. Mustafa II, passed the July 1991 Bar examination and is an applicant for admission to the Bar of the District of Columbia. The Committee on Admissions ("the Committee") recommended that he be admitted to the Bar, despite its finding that Mustafa "converted to his personal use funds entrusted to him for expenditure in a law school program." We conclude, however, that on the record here, particularly the short period of time that has elapsed since his misconduct, Mustafa has failed to establish that he has the good moral character required for admission to the Bar. Accordingly, we deny his application for admission.

## I.

In his third year of law school at the University of California at Los Angeles, Mustafa and Larry Brennan served as co-chief justices of the law school's moot court program, and shared access to and control over the program's checking account.[1] Over a five-month period, between October 1990 and February 1991, Mustafa wrote thirteen checks totaling $4,331, approximately $3,510 of which he converted to his personal use.[2] On at least seven occasions, he wrote checks to reimburse himself for expenditures which had been, or would be, reimbursed by the university's accounting department. At other times, he failed to make any notation about the use of the

money or falsified the purpose of the checks.[3]

Mustafa admitted to Brennan on June 14, 1991, that he had taken $1,000 from the fund to pay his sister's bail and that he would repay the money from a loan he had arranged from his then-prospective employer. Several days later, Brennan discovered that less than $800 remained in the account, rather than the $1,300 he had expected; Brennan closed the account. On June 25th, Mustafa presented Brennan with a cashier's check for $2,200. On June 28th, Brennan disclosed Mustafa's misconduct to the law school dean; on the same day, Mustafa disclosed his misconduct to a law school professor and to the Committee. After an investigation, the university was satisfied that Mustafa had made full restitution and disposed of the matter by issuing a letter of censure to be placed in his confidential student discipline file for four years. As required by the university, Mustafa disclosed his misconduct to the law firm at which he is presently employed as a law clerk.

Following a hearing, the Committee found that Mustafa always intended to repay the sums taken from the fund, principally because he repaid $1,500 on January 2, 1991, kept an accurate mental record of how much he had taken from the fund, and made full restitution before there was any threatened action by the law school. The Committee was also impressed by Mustafa's honesty and forthrightness before the Committee and during the law school investigation. Moreover, Mustafa's references from two law school professors, three former members of the moot court program board, a former employer, and three partners and two associates from the law firm

---

**1.** The account held student-paid dues of $25.00 each to cover moot court expenses not paid by the university.

**2.** Mustafa explained that he used the funds principally to pay his rent and other bills, to pay a $1,000 bail for his sister, to lend another sister $750 so she could leave an abusive husband, and to pay expenses for a law student to compete in a Chicago moot court competition. Mustafa also assumed responsibility for approximately $811 which he claimed were legitimate

moot court program expenses for which he could provide no documentation.

**3.** In particular, on November 28, 1990, he wrote a check to himself for $1,500, stating falsely on the check stub that it was for air fare to a competition in New York. Mustafa returned this amount to the fund via a personal check on January 2, 1991. Again, on February 28, 1991, he wrote a check for $1,500, indicating on the stub that the check was for $75.00 for Girl Scout cookies.

where Mustafa is employed, were, to the Committee, powerful testimony of his current good character. The Committee unanimously recommended that Mustafa be admitted to the Bar.

## II.

■ In order to gain admission to the Bar, an applicant must demonstrate "by clear and convincing evidence, that the applicant possessed good moral character and general fitness to practice law in the District of Columbia" at the time of the applicant's admission. D.C.App.R. 46(e); *see In re Manville*, 538 A.2d 1128, 1132 (D.C.1988) (en banc) (*"Manville II"*). This court will "accept findings of fact made by the Committee unless they are unsupported by substantial evidence of record," will "make due allowance for the Committee's opportunity to observe and evaluate the demeanor of the applicant where relevant," and will "afford the Committee's recommendations some deference...." *In re Manville*, 494 A.2d 1289, 1293 (D.C.1985) (citations omitted) (*"Manville I"*).

■ Mustafa candidly acknowledges that he, like few others in his position, was placed in a position of trust in handling others' money and that he "failed that test." As the Committee recognized, Mustafa's conduct, while it did not result in a criminal conviction, "was sufficiently serious to require analysis under the principles laid down in [*Manville I*]." Of particular significance is the Committee's finding that Mustafa's conduct "could be considered criminal in nature and would almost invariably have resulted in the disbarment of an attorney admitted to practice." There is no doubt that an attorney who mismanages the funds of a client will ordinarily face disbarment. *In re Addams*, 579 A.2d 190, 191 (D.C.1990) (en banc). Similarly, an attorney convicted of a crime involving moral turpitude faces automatic disbarment. D.C.Code § 11–2503(a) (1989); *In re Hopmayer*, 625 A.2d 290, 292 (D.C.1993) *In re McBride*, 602 A.2d 626, 629 (D.C.1992) (en banc). A disbarred attorney would be ineligible to apply for reinstatement for five years. D.C.Bar R. XI, § 16(e); *Hopmayer, supra*, 625 A.2d at 292. While we do not hold as a matter of law that an applicant for admission to the Bar, like a disbarred attorney, must necessarily wait a minimum of five years from the date of proven misconduct[4] before applying for admission to the Bar, we conclude that on the record here, particularly the relatively short period of time that has elapsed since the date of his misconduct, Mustafa has failed to establish that he has the good moral character required for admission to the Bar. *Cf. In re Polin*, 630 A.2d 1140, 1142 (D.C. 1993) (*"Polin II"*) (applicant admitted to the Bar six and one-half years after his conviction of conspiracy to distribute cocaine and two years after being denied admission to the Bar).

In reaching this conclusion, we are mindful of Mustafa's outstanding law school record[5] and his appropriate conduct since the embezzlement: he cooperated with the university and the Committee; he has married; and he has volunteered in several community projects since coming to the District of Columbia. As we said in *In re Polin*, 596 A.2d 50, 55 (D.C.1991) (*Polin I"*), "[i]t is by no means our purpose to discourage the applicant" from continuing his positive personal and professional de-

---

**4.** We note that, for a number of reasons, including the total time required for investigating and conducting criminal and/or disbarment proceedings, a disbarred attorney may be ineligible for reinstatement to the bar for much longer than five years after his or her misconduct. *See, e.g., Addams, supra*, 579 A.2d at 199 (five-year disbarment period begins eight years after misconduct); *In re Buckley*, 535 A.2d 863, 865 (D.C.1987) (disbarment period begins four years after misconduct). The process of reinstatement is also time consuming, usually taking over a year. *See, e.g., In re Shorter*, 603 A.2d 462 (D.C.1992) (petition for reinstatement granted thirteen months after filing).

**5.** Mustafa was a staff member and editor of the law review; he was one of two co-chief justices of the moot court program; was named one of twelve outstanding advocates during his second year of law school; and was one of three graduating law students selected by the law school Dean, Susan Westerberg Prager, to attend an annual donors' dinner. He also participated in several other law school activities.

velopment. *Id.* Indeed, on the record here, it appears likely that Mustafa will be able to establish the requisite good moral character at some future time. At present, however, "[o]ur consideration of the entire record leaves us unpersuaded that [Mustafa] now possesses 'those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observation of fiduciary responsibility, that have ... been compendiously described as [the] "moral character" necessary for the practice of law." *id.* at 55 (quoting *Schware v. Board of Bar Examiners,* 353 U.S. 232, 247, 77 S.Ct. 752, 761, 1 L.Ed.2d 796 (1957) (Frankfurter, J., concurring)). In sum, Mustafa has not demonstrated his present fitness for the privilege of membership in the District of Columbia Bar.

Accordingly we deny Mustafa's application for admission to the Bar of the District of Columbia.

*So Ordered.*