**In re Christopher Lindsey KLEPPIN,**

**An Applicant for Admission to the Bar of the District of Columbia Court of Appeals.**

**No. 01–BG–192.**

District of Columbia Court of Appeals.

March 22, 2001.

and, therefore, we affirm that portion of the

Before FARRELL and REID, Associate Judges, and KING, Senior Judge.

PER CURIAM:

Christopher Lindsey Kleppin passed the February 1998 bar examination for the District of Columbia and is an applicant for admission to the bar. The Committee on Admissions (Committee) has recommended his admission despite the fact that in January 1992 Kleppin pleaded guilty to conspiracy to distribute marijuana under Maryland state law, for which he was sentenced to a year of incarceration (six months of which was suspended in favor of lengthy probation). In 1996 Kleppin passed the Florida bar examination, but in 1998 he was denied admission to that bar.

order imposing a fine for retaliation.

■ D.C.App. R. 46 provides that bar applicants must demonstrate good moral character and fitness to practice law in the District of Columbia. In reviewing the Committee's determination that an applicant has met that burden, and its accompanying recommendation for admission, "[t]his court will accept findings of fact made by the Committee unless they are unsupported by substantial evidence of record, will make due allowance for the Committee's opportunity to observe and evaluate the demeanor of the applicant where relevant, and will afford the Committee's recommendations some deference...." *In re Mustafa*, 631 A.2d 45, 47 (D.C.1993) (citations and internal quotation marks omitted).

■ "[A] criminal conviction does not *per se* require exclusion of the applicant from the Bar." *In re Sobin*, 649 A.2d 589, 591 (D.C.1994). But our decisions reflect the difficulty of determining what "proof of the requisite rehabilitation following conviction of a serious crime" will suffice to justify admission. *In re Polin*, 630 A.2d 1140, 1141 (D.C.1993) (*Polin II*); *compare, e.g., Sobin, supra* (admitting applicant) *with Mustafa, supra* (denying admission). We therefore benefit from—and give corresponding deference to—painstaking analysis of the application such as the Committee engaged in this case. Moreover, as when we impose attorney discipline, our decisions regarding admission must aim to treat like cases alike. *Cf.* D.C. Bar R. XI, § 9(g)(1) (the court "shall adopt the recommended disposition of the Board [on Professional Responsibility] unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct").

■ The Committee was "guided substantially" by the similarities between this case and *Polin, supra,* and we also perceive its strong resemblance—in terms of both offense conduct and proof of rehabilitation—to *Sobin, supra. See* 649 A.2d at 590–92. Both of those decisions adopted the recommendation for admission. At a lengthy hearing, the Committee assessed Kleppin's comportment since the crime and heard corroborative testimony of his rehabilitation that apparently had not been presented to the Florida bar officials. Essentially for the reasons stated by the Committee, whose report we attach hereto, we accept and adopt the recommendation of the Committee and grant Kleppin's application for admission to the bar of the District of Columbia.[*]

*So ordered.*

## APPENDIX

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND RECOMMENDATION OF THE COMMITTEE ON ADMISSIONS

Christopher Lindsey Kleppin has applied to become a member of the District of Columbia Bar.

Mr. Kleppin passed the February 1998 bar examination. However, his application disclosed that he had been arrested for possession of drug paraphernalia, which charge was dismissed, convicted of conspiracy to distribute marijuana, for which he was incarcerated and placed on probation, and denied admission to the Florida Bar. Consequently, the Committee on Admissions ("Committee") initiated an investigation and conducted a formal hearing on his application pursuant to D.C.App. R. 46(f).

The Committee now finds that Mr. Kleppin has demonstrated his complete rehabil-

---

[*] We do not align ourselves with the Committee's finding that it was "understandable" Kleppin would misinform his law school that his earlier withdrawal from his studies had been caused by a "family crisis," rather than his incarceration. It is a lame excuse for one intending to become a member of the bar to claim he was merely "following his lawyer's advice" in concealing the true state of affairs. We nonetheless find insufficient reason to reject the Committee's otherwise persuasive case for treating this application as we have like cases in the past.

itation by clear and convincing evidence and, accordingly, that he possesses the requisite good moral character and general fitness to practice law. *See In re Polin*, 630 A.2d 1140 (D.C.1993) (*Polin II*) (approving admission of applicant convicted of conspiracy to distribute cocaine who had demonstrated his rehabilitation within six and one-half years of his release from prison). Therefore, the Committee recommends that he be admitted to the District of Columbia Bar.

### FINDINGS OF FACT

Mr. Kleppin passed the February 1998 bar examination. His application for admission indicates that he was graduated from the University of Maryland in December 1990 with a Bachelors of Science degree and from Nova Southeastern University Shepard Broad Law Center in May 1996 with a Juris Doctor. (R.23) Prior to applying to the D.C. Bar, Mr. Kleppin applied to the Florida Bar. As of the date of his application to this Bar, his Florida application was pending (R.6), but the Florida Board of Bar Examiners recommended against his admission on June 2, 1998 (R.84–95), and the Florida Supreme Court denied a petition for review. (R.647)

#### Criminal History

Mr. Kleppin grew up in rural Tennessee and moved with his family to Anne Arundel County, MD, after he was graduated from high school. He attended Anne Arundel County Community College from 1986 until 1988, and the University of Maryland at College Park from September 1988 until December 1990. While a student at the University of Maryland, in 1989, Mr. Kleppin joined a fraternity and he was introduced to marijuana, which he used from mid 1989 until the early Fall of 1990. (R.18–19, 854) Shortly after he started using marijuana, Mr. Kleppin learned that he could sell it. Mr. Kleppin sold drugs occasionally for the next eighteen months approximately, until late Jan-

uary 1991. By his count, he engaged in some 16–20 transactions, from which he profited $50 or $100 per pound sold. (R.846, 855) For a period of time, Mr. Kleppin never acquired less than one pound for sale, and he would sometimes obtain as much as five to ten pounds on consignment. (R.22) There were also approximately two times that Mr. Kleppin sold cocaine. (R.20)

Mr. Kleppin's criminal activities led to two arrests. He was arrested first on June 1, 1990 in Hyattsville, MD and charged with possessing drug paraphernalia, a device to smoke marijuana. (R.65) That charge was dismissed. (R.21) According to Mr. Kleppin, he had the misfortune of being present at the home of an associate when the Hyattsville City police executed a warrant for the associate's arrest. Mr. Kleppin and others who were present were charged with possession of drug paraphernalia that was in plain view at the time of the arrest. (R.19–21) Mr. Kleppin had previously sold marijuana and cocaine to this associate, although not on that occasion.

Following this arrest, Mr. Kleppin resumed selling marijuana in the Fall of 1990. (R.22) On December 5, 1990, Mr. Kleppin supplied a quantity of marijuana to the target of an undercover investigation. (R.98) The target then informed on Mr. Kleppin. (R. 22–24, 846–854) A "sting" was set up, and Mr. Kleppin was again arrested on January 31, 1991, for possession of marijuana with intent to distribute. (R.28) Mr. Kleppin and other suppliers and co-conspirators were later indicted on March 1, 1991. (R.30) He was named in five counts of the twenty-two count indictment, charged with conspiracy to distribute marijuana, distribution of marijuana, possession of marijuana with the intent to distribute (two counts), and possession of marijuana. (R.29–37)

Mr. Kleppin pleaded guilty on January 24, 1992 to conspiracy to distribute marijuana, a misdemeanor, and the other charges were dismissed. (R.96–109) Mr.

Kleppin had already offered to cooperate with the State's Attorney and the Prince George's County Police prior to the entry of his plea. (R.24) As part of the plea agreement, the prosecutor agreed to make an affirmative recommendation for a suspended sentence if Mr. Kleppin cooperated with the State. (R.99, 102) Mr. Kleppin provided assistance through his sentencing. (R.104) And, between the guilty plea and the sentencing, in Fall 1992, Mr. Kleppin enrolled in law school. (R.100)

At the sentencing, the prosecutor informed the court that Mr. Kleppin had provided "useful valuable information," that he had maintained regular contact with the Prince George's County Police, and that his cooperation was "successful." (R.105, 106) The prosecutor recommended a sentence of probation. (R.105) However, the court rejected the recommendation, and Mr. Kleppin was sentenced to a term of one year's incarceration, with all but six months suspended, plus five years of probation. (R.107) The court refused to allow Mr. Kleppin to start his incarceration after he completed the law school semester. (R.107)

Mr. Kleppin was released from incarceration in February 1993 and he re-entered law school the following August. (R.25) Mr. Kleppin was released successfully from probation in April 1997. (R.431)

### Florida Bar Admission

Mr. Kleppin applied for admission to the Florida Bar in May 1996 and he passed its July 1996 examination. (R.435) The Florida Board of Bar Examiners denied admission the Florida Bar on June 2, 1998, after a hearing. (R. 84–95, 435)

The Florida Board of Bar Examiners issued six Specifications, or charges, against Mr. Kleppin. The Specifications focused on Mr. Kleppin's criminal record and six instances of alleged lack of candor. In summary, the Specifications were as follows: (1) Mr. Kleppin engaged in the distribution or sale of illegal drugs, for which he was arrested twice and convicted of conspiracy to distribute marijuana. (2) He represented to his law school in November 1992, following his sentencing and incarceration, that he had interrupted his studies due to a "family emergency," which was allegedly untrue. (3) He informed the Florida Bar that his conspiracy conviction in Prince George's County, Maryland was a misdemeanor charge, which was allegedly untrue. (4) He submitted an application for a consumer loan in 1990 in which he represented that he was employed as a "Project Manager," which was allegedly untrue. (5) He represented in his law school application that he had owned a baseball card business while in college, which was allegedly untrue. (6) In a 1996 application to the post-graduate law program at The George Washington University Law School, he allegedly concealed his 1992 conviction, (i) by stating that it had occurred while he was an undergraduate and (ii) by failing to disclose that his law school career was interrupted by his incarceration. (R.86–89)

Mr. Kleppin admitted Specifications (1), (2), (4), and (6) and he denied Specifications (3) and (5). (R.89–93) Based on these admissions and denials, the Board found Specifications (1), (2), (4), and (6) to have been proven and Specifications (3) and (5) to have been unproven. *Id.* The Board concluded that Mr. Kleppin's "presentation was deficient of the extra effort required of all bar applicants attempting to demonstrate rehabilitation." (R.95) Accordingly, it recommended against his admission to the Florida Bar. *Id.* Mr. Kleppin's appeal to the Supreme Court of Florida was rejected in February 1999. (R.647)

### Mr. Kleppin's Application To The District of Columbia Bar

Mr. Kleppin's application to the District of Columbia Bar, the supporting documents, and his testimony at the Committee's hearing addressed his criminal record and responded to the reasons given by the

Florida Board of Bar Examiners for rejecting his application to the Florida Bar.

Mr. Kleppin freely admitted his having distributed marijuana and, to a lesser extent, cocaine over approximately eighteen months, from the Fall of 1989 to January 31, 1991. (R.18–25) He accepted responsibility for his criminal acts and acknowledged that he was motivated solely by money. (R.841) While in college, Mr. Kleppin aspired to a career as a professional golfer, and he testified that he was unable to find work to support his college studies and his golf career. (R.841, 852–854) As he had in Florida, Mr. Kleppin expressly disclaimed any contention that he had sold drugs to support a drug dependency. (R.128–129)

In addition, Mr. Kleppin acknowledged that he had misrepresented his reason for leaving law school in October 1992, after he was incarcerated, as a "family crisis." (R.866–869) He explained that he had followed the advice of his attorney, even though he recognized at the time that he was receiving "poor advice." (R.868) According to Mr. Kleppin, the attorney prevailed upon him to cite "family crisis" as grounds for his withdrawal from law school, rather than admit to his conviction and incarceration, in order to preserve the option of a quick re-enrollment, with the law school none the wiser. (R.868) Mr. Kleppin's recollection of his attorney's advice was confirmed. The record before the Committee includes a letter to the Florida Board of Bar Examiners from Mr. Kleppin's counsel in the conspiracy case, in which the attorney stated that Mr. Kleppin's description of his advice is correct "in all aspects," and he expressed regret for having failed to anticipate the long-term consequences of that advice. (R.480)

With respect to the 1990 consumer credit application, Mr. Kleppin explained that he had unthinkingly copied from a previous, rejected loan application which contained the same falsehood. (R.857–861) The misrepresentation of his employment status was admittedly unnecessary because Mr. Kleppin's father, who was credit-worthy, co-signed both the second application and the loan. (R.859)

Regarding his application to the masters program at The George Washington University Law School, Mr. Kleppin testified that he was too embarrassed by his incarceration to disclose it, and so he left blank his answer to the pertinent question. (R.871–873) He claimed that he had not intended to mislead the school, however, when he reported that his conspiracy conviction occurred as an undergraduate; instead, he meant to report that the crime and the arrest occurred during his undergraduate career. (R.872)

Mr. Kleppin's application was supported by character evidence, in the form of letters, affidavits, and testimony (R.69–70, 436, 664–702, 723–827), which is summarized below.

### ANALYSIS AND CONCLUSIONS OF LAW

Applicants to the District of Columbia Bar must demonstrate by clear and convincing evidence that they possess "good moral character and general fitness to practice law." D.C.App. R. 46(e). Because of Mr. Kleppin's criminal record and because of the recent denial of his Florida Bar application, the Committee has evaluated his application in accordance with the Court of Appeals' *Manville* decisions, *In re Manville,* 494 A.2d 1289 (D.C.1985) (*Manville I*); *In re Manville,* 538 A.2d 1128 (D.C.1988) (*Manville II*), and their progeny.

Taken together, the *Manville* decisions hold that prior criminal convictions do not necessarily disqualify a bar applicant on character and fitness grounds. Instead, the court considers an applicant's present moral character and fitness and permits the applicant to be admitted upon sufficient proof of the applicant's "'full and complete rehabilitation.'" *Manville I,* 494 A.2d at 1295–96 (quoting *Application of Davis,* 38 Ohio St.2d 273, 313 N.E.2d 363,

364 (1974), reaffirmed en banc, *Manville II*, 538 A.2d at 1132).

In cases like this one, the Court of Appeals has consistently balanced the seriousness and length of an applicant's misconduct against the positive evidence of the applicant's character over an extended period of time. *E.g., Manville I* and *Manville II, supra; In re Sobin*, 649 A.2d 589 (D.C.1994); *Polin II, supra*, 630 A.2d 1140. *Manville I* identified eleven non-exclusive factors to be evaluated in assessing the character and fitness of applicants with criminal records. *Manville I, supra*, 494 A.2d at 1296–97.[1] The Committee has considered each of them in arriving at its recommendation in this matter.

While our decision was not forecast by any prior opinion, we have been guided substantially by the Court's *Polin* opinions, *In re Polin*, 596 A.2d 50 (D.C.1991) (*Polin I*) and *Polin II, supra*. The *Polin* opinions involved an applicant who was convicted at trial of conspiracy to distribute cocaine. Polin dealt cocaine extensively over a period of more than three years to support his cocaine addiction. *Polin I*, 596 A.2d at 51–52. Polin sold cocaine while he was employed as a paralegal at the U.S. Justice Department. *Id.* at 52, 55. Polin also perjured himself at trial to avoid conviction. *Id.* at 52. Upon his conviction, he served twenty months in a federal prison, three months in a halfway house, and six months on probation. *Id.* Less than two years after his release, Po-lin applied for admission to the District of Columbia Bar, and the Committee recommended his admission one year later because of impressive evidence of his rehabilitation. In *Polin I*, the Court of Appeals denied Polin admission to the Bar, because it had been, as of the date of the Court's decision, only four and one-half years since Polin's release from supervision. The Court concluded that not enough time had passed to conclude that Polin was fully rehabilitated. The Court held, "[W]e are not persuaded that the duration and quality of Polin's good behavior, as impressive though it is, suffices to establish present good moral character." *Id.* at 53.

When Polin again applied for admission, the Committee conducted a full investigation of his character, and we again recommended his admission. *Polin II*, 630 A.2d at 1143. This time, the Court adopted our recommendation, noting that Polin had accomplished much in the six and one-half years since his release. *Id.* at 1142. The Court concluded, "[W]e conclude that the time has been reached in this particular case when no purpose would be served by requiring a more extended demonstration of worthiness for admission." *Id.*

We believe that Mr. Kleppin has earned admission to the District of Columbia Bar, just as Polin ultimately did. Mr. Kleppin's offenses were serious, although not as serious as Polin's; his conduct did not occur over as protracted a time as Polin's; and he cooperated with law enforcement in-

---

1. The eleven non-exclusive factors to be evaluated under *Manville I* are as follows:
    1. the nature and severity of the offenses committed;
    2. the number and duration of offenses;
    3. the age and maturity of the applicant when the offenses were committed;
    4. the social and historical context in which the offenses were committed;
    5. the sufficiency of the punishment undergone and restitution made in connection with the offenses;
    6. the grant or denial of a pardon for offenses committed;
    7. the number of years that have elapsed since the last offense was committed, and the presence or absence of misconduct during that period;
    8. the applicant's current attitude about the offenses (*e.g.*, acceptance of responsibility for and renunciation of past wrongdoing, and remorse);
    9. the applicant's candor, sincerity and full disclosure in the filings and proceedings on character and fitness;
    10. the applicant's constructive activities and accomplishments subsequent to the criminal convictions; and
    11. the opinions of character witnesses about the applicant's moral fitness.

stead of perjuring himself. Moreover, it has been a sufficiently long period of time since Mr. Kleppin last committed a crime—more than a decade—for us to conclude that he currently possesses the moral character to be admitted to the Bar.

Our analysis of the *Manville* factors leads us to the conclusions set forth below.[2]

*1 & 2. The nature and severity of the offenses committed; the number and duration of offenses*

Mr. Kleppin occasionally sold marijuana over a period of approximately eighteen months. He estimates that he sold marijuana 16–20 times, profiting about $50 or $100 per pound on each sale. He also sold cocaine, about two times. Mr. Kleppin pleaded guilty to belonging to a conspiracy that lasted barely two months, according to the indictment. (R.30)

*3 & 4. The age and maturity of the applicant when the offenses were committed; the social and historical context in which the offenses were committed*

Mr. Kleppin's criminal conduct occurred when he was age 20–21. Mr. Kleppin testified that he had lived a sheltered life, without exposure to illegal drugs, through his graduation from high school. He grew up in a fundamentalist community in rural Tennessee. After high school graduation, when his family moved to Maryland, Mr. Kleppin lived at home and commuted to Anne Arundel Community College for two years. He was first exposed to drug use when he enrolled at the University of Maryland in College Park and joined a fraternity. He was surprised and amazed by the pervasive use of marijuana at the fraternity. He tried marijuana and did not

enjoy it, but he learned that he could make money by selling it. (R.835–842)

*5. The sufficiency of the punishment undergone and restitution made in connection with the offenses*

Mr. Kleppin served approximately four months of a six month sentence and he was on probation for four years. Mr. Kleppin had no prior convictions, and the prosecutor recommended a sentence of probation only. Mr. Kleppin was not required to pay restitution. (R.125–126)

*6. The grant or denial of a pardon for offenses committed*

There is no evidence that Mr. Kleppin sought or received a pardon.

*7. The number of years that have elapsed since the last offense was committed, and the presence or absence of misconduct during that period*

Mr. Kleppin's last offense was committed more than ten years ago, on January 31, 1991. There is no evidence that Mr. Kleppin committed any criminal offenses after his arrest on that date.

*8. The applicant's current attitude about the offenses (e.g., acceptance of responsibility for and renunciation of past wrongdoing, and remorse)*

Mr. Kleppin's attitude about his criminal conduct has been appropriate since his 1991 arrest. Before his guilty plea, he offered assistance to the State's Attorney for Prince George's County. He did not contest the criminal charges or falsely deny culpability. *Compare Polin I*, 596 A.2d at 55. He cooperated "successfully" with law enforcement, providing "useful valuable information." Before this Committee and before the Florida Board of

---

2. In applying the *Manville* factors, we have combined our analysis of certain related considerations.

Bar Examiners, Mr. Kleppin accepted responsibility for his misconduct and expressed remorse.

9. *The applicant's candor, sincerity and full disclosure in the filings and proceedings on character and fitness*

Mr. Kleppin disclosed fully his criminal activities in his written submissions to the Committee and he testified at length about them. He provided the Committee with a record of the Florida Bar proceedings, including the report of the Board of Bar Examiners and a transcript of its hearing. (R.494–555)

Mr. Kleppin also disclosed his criminal activities at appropriate times to others. For example, he told his future wife, a fellow law student, about his conviction and incarceration soon after his release from prison. (R.492–493) He disclosed timely the conviction to his employer. (R.732–733, 735–736, 742–743)

Mr. Kleppin's failure to disclose his conviction to his law school is troubling, but understandable. Mr. Kleppin only followed his lawyer's advice when he mischaracterized the reason for his withdrawal as a "family crisis." However, his failure to make full disclosure to The George Washington University Law School is less understandable. We believe that Mr. Kleppin ought to have completed accurately his application for admission to the masters program, even if he was embarrassed by his conviction. His application left the law school with the incorrect impression that he was convicted as an undergraduate but never incarcerated. Still, the application was submitted about five years ago, and Mr. Kleppin has consistently made appropriate disclosures since then.

10. *The applicant's constructive activities and accomplishments subsequent to the criminal convictions*

Since his conviction, Mr. Kleppin completed law school, a post-graduate legal program, and passed two bar exams. He was twelfth in his class at Nova Southeastern University Shepard Broad Law, where he was also editor-in-chief of a law review with responsibility for paying its expenses. (R.870, 880)

Mr. Kleppin has performed some good deeds since he was convicted. While he attended the post-graduate program, he often assisted an elderly neighbor. He discovered a rare plant in his Maryland neighborhood, and he made a significant effort to preserve it. (R.666–667) He continues to be involved in environmental protection programs and activities (R.666–668, 697) More recently, Mr. Kleppin has become an enthusiastic member of his church, participating in various retreats and community service programs. (R.682–686, 687–689, 690, 691–694, 760–827) The Committee was most impressed by his work on a trip to Haiti, where he labored for five days at rehabilitating a church mission called "Village of Hope," a facility dedicated to feeding and training the poor. As of the date of hearing, Mr. Kleppin had also completed training to minister to prison inmates. (R.691–694)

11. *The opinions of character witnesses about the applicant's moral fitness*

Mr. Kleppin offered the Committee an array of character evidence, in the form of letters, affidavits, and testimony. Mr. Kleppin's character witnesses uniformly described him as honest, trustworthy, and hard-working. (R.662–702) All were aware of his criminal conviction and the Florida Bar proceedings, including the Specifications, and all recommended his admission without hesitation.

The Committee heard at length from Dr. Ronald Dingle, the Senior Pastor of Mr. Kleppin's church. Although the church has some 2,000 members and Mr. Kleppin was a recent member, Dr. Dingle knew Mr. Kleppin personally. According to Dr. Dingle, Mr. Kleppin is dedicated to

the Church's service ministries. (R.762–766) Dr. Dingle testified that Mr. Kleppin was sincerely committed to his faith and that he was impressed with Mr. Kleppin's integrity. (R.766, 789–793) According to Dr. Dingle, Mr. Kleppin enjoyed an excellent reputation in the church community, which was verified by affidavits from other church members. (R.774–780, 682–686, 687–689, 690, 691–694)

The Committee also heard from Harry Boreth, Esquire, who has practiced law for more than thirty-four years, most recently as a plaintiff's attorney in the area of employment discrimination. (R.725) Mr. Boreth employs Mr. Kleppin as a researcher and paralegal. (R.726) Mr. Boreth testified at length about Mr. Kleppin's strong work ethic and his dedication to victims of employment discrimination. (R.727–730) Mr. Boreth expressed his strong opinion that Mr. Kleppin has the integrity to practice law, notwithstanding his past criminal activities. *Id.* Mr. Boreth also confirmed Mr. Kleppin's commitment to his church's community service programs. (R.738)

### RECOMMENDATION

Christopher Kleppin supported himself as an occasional drug dealer for about eighteen months while he was in college. His last offense was more than ten years ago. After he was arrested the second time, he pleaded guilty, cooperated with law enforcement, and served time in prison and on probation. Over the past decade, he completed law school at the top of his class and a masters program at The George Washington University Law School. He has not committed any other criminal offenses, and the persons who know him best all attest to his present good moral character. But for his failure five years ago to disclose his conviction to The George Washington University Law School, we would say that he has led a consistently exemplary life in the decade since he abandoned his criminal conduct.

Notwithstanding this one misstep, and considering the entirety of his conduct as developed in the record in light of the factors enumerated in *Manville I*, we recommend his admission to the District of Columbia Bar. The Committee is mindful of the fact that Florida denied Mr. Kleppin admission to its Bar just two years ago, but we are persuaded that, given the passage of time and Mr. Kleppin's continued and renewed efforts to demonstrate his rehabilitation, "no purpose would be served by requiring a more extended demonstration of worthiness for admission." *Polin II,* 630 A.2d at 1142.

Respectfully submitted,

/s/ ———

Richard B. Nettler, Chair

Committee on Admissions

February 21, 2001