*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 25-BG-0333

IN RE JEAN M. ROBINSON, PETITIONER.

A Suspended Member of the Bar
of the District of Columbia Court of Appeals
(Bar Registration No. 484954)

On Exceptions to a Recommendation of the Board on
Professional Responsibility Ad Hoc Hearing Committee

(BDN: 23-BD-039; DDN: 2023-D134)

(Argued January 27, 2026                    Decided April 23, 2026)

*Hilary Holt LoCicero* for petitioner.

*Theodore (Jack) Metzler*, Senior Assistant Disciplinary Counsel, with whom *Hamilton P. Fox, III*, Disciplinary Counsel, *Julia L. Porter*, Deputy Disciplinary Counsel, and *Jelani C. Lowery*, Assistant Disciplinary Counsel, were on the brief for the Office of Disciplinary Counsel.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and SHANKER, *Associate Judges*.

BECKWITH, *Associate Judge*: Jean M. Robinson, an attorney suspended by this court in 2019 from practicing law for eighteen months, seeks reinstatement to the Bar of the District of Columbia. Following two evidentiary hearings, an ad hoc hearing committee recommended that we deny her reinstatement petition because

Ms. Robinson failed to demonstrate her fitness by clear and convincing evidence. For the reasons that follow, we decline to adopt that recommendation and grant her petition.

### I. Facts and Procedural History

This court approved a negotiated-discipline petition that suspended Ms. Robinson from the practice of law in the District of Columbia for eighteen months after determining that she had "intentionally prejudic[ed] her client in the course of the attorney-client relationship, reveal[ed] client confidences or secrets, and act[ed] with dishonesty, fraud, deceit, or misrepresentation." *In re Robinson*, 207 A.3d 169, 169 (D.C. 2019) (per curiam) (mem.).[1]  Ms. Robinson was disciplined for her conduct when she was the general counsel of SourceAmerica, a Virginia-based non-profit that became the subject of federal criminal investigations and litigation during her tenure.  Among other transgressions, the hearing committee found that she revealed SourceAmerica's confidential information to an affiliate, knowing that it would reach federal investigators.  She did not violate the rules to benefit herself, but rather because she thought that SourceAmerica would correct its wrongdoing if

---

[1] As a result of those proceedings, Ms. Robinson was reciprocally disciplined in Wisconsin.  In 2021, her Wisconsin law license was reinstated after she showed that she was fit to practice by clear, satisfactory, and convincing evidence.

she disclosed the information.

After her suspension period elapsed, Ms. Robinson petitioned for the reinstatement of her D.C. law license. At the first of two evidentiary hearings, Ms. Robinson presented the testimony of two live witnesses—attorneys John Daniels, who had known her since she was in law school, and Kelly Kramer, who represented her in proceedings stemming from her misconduct.

Ms. Robinson also testified at that hearing. Based on her testimony and proposed findings of fact, the hearing committee became concerned that she had engaged in the unlicensed practice of law years prior in both D.C. and Virginia— and that she was now being evasive about it. Prior to 2004, Ms. Robinson was licensed only in Wisconsin, but she began providing legal services in D.C. in 1990 and in Virginia in 1996, despite not obtaining a D.C. law license until 2004 or a Virginia corporate counsel certificate until 2008.[2] To address its concerns, the hearing committee asked Ms. Robinson to file a sworn statement "explaining whether . . . there were applicable exceptions that allowed her to practice law in" those jurisdictions. Ms. Robinson filed a supplemental affidavit in which she stated that, as best she could recall, after 1990 she "served as outside general counsel for

---

[2] This certificate allowed her to provide legal services as in-house counsel without becoming a member of the Virginia Bar.

various national 501(c)(3) non-profit clients, which [she] understood was permissible based on exceptions to the Rules of the District of Columbia Court of Appeals and the Virginia Rules of Professional Conduct[,] which allowed foreign lawyers to represent corporate clients in federal matters."

The hearing committee held a second evidentiary hearing focused on the alleged unauthorized practice of law at which Ms. Robinson again testified. The committee reassured Ms. Robinson that it was "not concerned so much with the unauthorized practice of law," but that instead "this [wa]s a credibility issue." Ms. Robinson testified that she did not initially become a member of the D.C. Bar because her work was federal in nature and when state-law questions arose, she used outside counsel. Though she could not recall the wording of the D.C. Bar Rule governing the unauthorized practice of law in effect during the relevant period, she believed it was materially different than the modern analogous rule and that it permitted her to avoid becoming a member of the D.C. Bar so long as her practice remained exclusively federal. She also could not remember the wording of the Virginia rule in effect at the time but believed that rule also authorized her conduct. She recalled that she, the D.C. firm she was employed by, and the American Corporate Counsel Association all "looked at multijurisdictional practice issues" and "felt like [she] was within" those rules "based on the practice of having a federal procurement practice."

Ultimately, the hearing committee issued a report recommending that we deny Ms. Robinson's petition for reinstatement because she had failed to meet her burden of proving her present character to practice law by clear and convincing evidence.

## II. Analysis

"Although we place great weight on the recommendation[] of the . . . Hearing Committee, this court has the ultimate authority to decide whether to grant a petition for reinstatement." *In re Yum*, 187 A.3d 1289, 1291 (D.C. 2018) (quoting *In re Sabo*, 49 A.3d 1219, 1224 (D.C. 2012)).[3] An individual seeking reinstatement has the

---

[3] At oral argument, the Office of Disciplinary Counsel (ODC) suggested that it would be unprecedented for this court to grant Ms. Robinson's reinstatement petition when the hearing committee recommended otherwise. First, we note that in *In re Sabo*, we granted a petition for reinstatement even though the Board on Professional Responsibility opposed the petition. 49 A.3d at 1221. Though it is true that in that case both the Bar Counsel and the hearing committee recommended reinstatement, *id.*, we have been consistently clear that "this court has the ultimate authority to decide whether to grant a petition for reinstatement," *id.* at 1224; *accord In re Bettis*, 644 A.2d 1023, 1027 (D.C. 1994). That is, we conduct an independent inquiry into whether the petitioner has met the reinstatement criteria. *In re Sabo*, 49 A.3d at 1224. Our Bar Rules also make clear that this court is the final arbiter of reinstatement petitions. *See* D.C. Bar R. XI, § 16(a) ("A disbarred attorney . . . shall not resume the practice of law until reinstated by order of the Court."); *id.* § 16(d)(2) ("Within sixty days after the conclusion of its hearing on reinstatement and receipt of the final briefs by the parties, the Hearing Committee shall submit to the Court a report containing its findings and *recommendation* . . . ." (emphasis added)). Those rules are also explicit that we need not procure the Board's recommendation prior to our decision, underscoring our ultimate authority in this area. *Id.* § 16(d)(2) ("In its *discretion*, the Court may request a recommendation by the Board concerning

burden of showing by clear and convincing evidence (1) that she "has the moral qualifications, competency, and learning in law required for readmission," and (2) that her reinstatement "will not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive to the public interest." *Id.* at 1291-92 (citation modified) (quoting D.C. Bar R. XI, § 16(d)(1)). We "defer to the Hearing Committee's findings of fact, including credibility determinations, unless those findings are not supported by substantial evidence." *In re Stuart*, 290 A.3d 20, 27 (D.C. 2023).

Our analysis is guided by the five *Roundtree* factors. *See In re Yum*, 187 A.3d at 1292 (citing *In re Roundtree*, 503 A.2d 1215, 1217 (D.C. 1985)). First, we examine "the nature and circumstances of the misconduct for which the attorney was disciplined," and where the petitioner's conduct is closely intertwined with her role as an attorney, we proceed to apply heightened scrutiny to the remaining factors. *Id.* Second, we evaluate "whether the attorney recognizes the seriousness of the misconduct." *Id.* Third, we consider "the attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones." *Id.* Fourth, and most important here, we look to "the attorney's present character."

---

reinstatement." (emphasis added)). Though we afford great weight to the hearing committee's position, there is no barrier preventing this court from granting Ms. Robinson's reinstatement petition despite the committee's contrary recommendation.

*Id.* Fifth, we evaluate "the attorney's present qualifications and competence to practice law." *Id.*

As to the first factor, the hearing committee noted—and Ms. Robinson now concedes—that heightened scrutiny applies in this case because the nature of Ms. Robinson's violation was that she "repeatedly and intentionally betrayed her client by violating client confidences over a long period of time," which is closely intertwined with the practice of law. *See id.* at 1292. We concur and therefore apply heightened scrutiny to the remaining factors.

The hearing committee found that Ms. Robinson satisfied her heightened burden as to *Roundtree* factors two, three, and five—and we agree. As to the second factor, the hearing committee found that Ms. Robinson "does recognize the seriousness of her misconduct" as reflected by the fact that "[s]he testified at length as to her better understanding of what she had done wrong, [and] its cost to her client, the legal community and to herself." Further, it determined that Mr. Daniels and Mr. Kramer had both credibly testified that "she appreciated how serious her misconduct had been." As to the third factor, the hearing committee concluded that Ms. Robinson had attempted to remedy her past wrongs and was unlikely to repeat her past misconduct, including because she cooperated with SourceAmerica after it

discovered her violations.[4]  And as to the fifth factor, the hearing committee found that Ms. Robinson "appears to be an intelligent person who has attempted to keep up with her areas of interest in the law," including by taking several continuing legal education (CLE) courses.  We discern no reason to deviate from the hearing committee's recommendations as to factors one, two, three, and five, and as the Office of Disciplinary Counsel (ODC) does not now argue that we should, we forgo a more thorough breakdown of our reasoning.

As to the fourth *Roundtree* factor, the hearing committee determined that Ms. Robinson failed to meet her burden.  On this factor, she is "required to prove that those traits that led to disbarment 'no longer exist and, indeed, that [s]he is a changed individual having full appreciation of the wrongfulness of h[er] conduct and a new determination to adhere to the high standards of integrity and legal competence'" that our Bar demands.  *In re Sabo*, 49 A.3d at 1232 (quoting *In re Turner*, 915 A.2d 351, 356 (D.C. 2006) (per curiam)).  As an initial matter, the hearing committee was

---

[4] In so doing, the committee did note that "[s]ince the discipline was imposed, [Ms. Robinson] has not practiced law, although her license in Wisconsin was reinstated in 2021.  Nor has she sought gainful employment apart from the consulting work done in the last few years."  It further stated that although she had "cooperate[d] with SourceAmerica in the aftermath of her betrayal[,] . . . she had little choice in the matter" because "[h]er client sued her and she needed to cooperate to help settle the dispute."  Nevertheless, it concluded that Ms. Robinson "is unlikely to repeat [her] violations" and that "[i]t is fair to say that she has attempted to remedy past wrongs."  (Internal quotation marks omitted.)

troubled by what it perceived as Ms. Robinson's "rambling and often not on point, sometimes approaching being evasive answers" at the second evidentiary hearing, focused on the alleged unauthorized practice of law violations, which indicated to the committee that she "ha[d] not recognized, or at least admitted, that she did not abide by the ethical rules." The committee also determined that the testimony of her live witnesses and her other evidence of present character did not rise to the heightened clear-and-convincing standard she must meet here. We disagree on both grounds, which we address in turn.

## A. Unauthorized Practice of Law

Before our court, ODC admits that it is "not clear that [we] should defer to the hearing committee's findings with respect to unauthorized practice in D.C." because (1) "[t]he text of the rule as it stood before the overhaul is not readily available online," and (2) "there were several widespread misconceptions about the unauthorized practice rule in the 1990s and early 2000s, particularly with regard to attorneys whose work involved federal matters." ODC similarly asserts that it is "unclear that [we] should defer to the hearing committee's findings with regard to unauthorized practice in Virginia and the reasons Robinson may have determined

not to seek admission there."[5]   We accordingly decline to defer to those determinations.  *See In re Tun*, 195 A.3d 65, 73 (D.C. 2018) (explaining that this court does not defer to determinations of "ultimate facts that are really conclusions of law" (citation omitted)).

Bolstering that conclusion is the dearth of reasoning in the hearing committee's report regarding its finding that Ms. Robinson had engaged in the unauthorized practice of law—as the report did not substantively apply either the D.C. or Virginia rule[6] in place at the relevant time despite acknowledging that there were "limited exceptions allowing for practice before certain federal agencies" and that the D.C. rule had potentially been amended during the relevant period.

We further opt not to defer to the hearing committee's characterization of Ms. Robinson's testimony on the matter—"rambling and often not on point, sometimes approaching being evasive"—because it was infected by the hearing committee's belief that Ms. Robinson knew that she had engaged in the unauthorized practice of

---

[5] The hearing committee had speculated in its report that Ms. Robinson would have had difficulty becoming a member of the Virginia Bar because of her prior Wisconsin discipline and because she had not yet been licensed to practice law for five years, which the Virginia Bar required to be admitted on motion.

[6] The report states that the hearing committee's "research did not suggest that there has ever been" a federal-matter exception in the Virginia rules, but ODC's brief cites to various Virginia opinions discussing such an exception.

law and was lying about it. The hearing committee was clear that its "concerns about [her] character would have been assuaged had she admitted to the unauthorized practice of law." But given ODC's representations to this court, there was insufficient evidence to support a conclusion that she knowingly engaged in the unauthorized practice of law and was lying about it. This is therefore the rare situation where the hearing committee's credibility determination does not warrant the normal deference because it was based on facts unsupported by the record. *See Murray v. D.C. Dep't of Emp. Servs.*, 765 A.2d 980, 983-85 (D.C. 2001).

We are similarly unpersuaded by the hearing committee's criticism of Ms. Robinson for failing to "cite the exceptions in the D.C. and Virginia Rules she referenced," which it took to be evidence of "her credibility and her attitude toward the ethical rules of the legal profession."[7] As ODC now admits, no one in the hearing

---

[7] The hearing committee also took issue with Ms. Robinson failing to "say that she limited her work for her clients to federal matters" in her supplemental affidavit. We agree with Ms. Robinson that her supplemental affidavit, which states that she "served as outside general counsel for various national 501(c)(3) non-profit clients, which [she] understood was permissible based on exceptions to" the rules that "allowed foreign lawyers to represent corporate clients in federal matters," is best read to contain the implied assertion that her work during that period was, in fact, limited to federal matters. That reading is strengthened by her testimony at the second evidentiary hearing that her work at the D.C. law firm "was all federal," that her work as an outside general counsel involved handling issues that arose "on the federal level," and that when state-law issues arose during her position as an outside general counsel, she "used outside counsel."

had a copy of the D.C. rule and it was not freely available online, and so we do not see it as evidence that she was being evasive.[8]

## B. Present Character

We turn next to whether Ms. Robinson proved by clear and convincing evidence her present fit character to practice law. A petitioner seeking reinstatement is required to "put on live witnesses familiar with the underlying misconduct who can provide credible evidence of [her] present good character." *In re Yum*, 187 A.3d at 1292 (quoting *Sabo*, 49 A.3d at 1232). Citing *In re Yum*, the hearing committee—despite crediting the testimony of both of Ms. Robinson's live witnesses—concluded that Ms. Robinson "offered [it] very little with which to work" given that (1) neither of the witnesses had "had regular contact with [her] since her suspension," and (2) the witnesses' "acquaintance with her was largely professional and not personal."

Mr. Daniels, a Wisconsin attorney, told the committee that he had known Ms. Robinson since she was a law student, tried to recruit her to work for his firm multiple times, and served on the SourceAmerica board of directors for a portion of

---

[8] As a result, we need not reach the question whether the hearing committee appropriately inquired into the alleged uncharged conduct, including whether it gave Ms. Robinson proper notice, because we assign no weight to the hearing committee's conclusions and determinations stemming from that inquiry.

the time that she was general counsel.  Over the past five years, he remembered speaking with Ms. Robinson fewer than twenty times.  He "had a chance to observe [Ms. Robinson] in her career from the time of being a law student to observing her in her roles as general counsel for two organizations," and he felt he "had a fairly good ability to observe her temperament and her abilities."  Regarding her work at SourceAmerica, he personally observed her legal work, which he thought was "superior in a very, very complicated environment."  He also stated that he "was aware of the general nature of [Ms. Robinson's] violation" of the ethical rules that led to her suspension and that she had been "open and candid with [him] regarding the circumstances of her discipline by the D.C. Bar."  His impression of Ms. Robinson was that she had "[a]bsolutely, absolutely" expressed her remorse to him about her unethical conduct and that she presently "clearly understands" that she is "bound by the Rules of Professional Conduct, no matter what [her] personal feelings may be as to fairness or unfairness."  Based on his "observation" of her "work to get readmitted to the Wisconsin Bar, to continue to be effective in knowing and understanding what it means to be a lawyer, to continue the CLE," he testified that Ms. Robinson understood "the seriousness of what occurred" and was "commit[ed] to practice law in a way consistent with the rules applicable to our profession."  In summation, he remarked that there was "no question" that Ms. Robinson presently had the requisite moral character to be a member of our Bar—"[s]he knows she made

a mistake, she's been transparent about the error," and as a result, "without hesitation . . . she'd be a great asset to the bar."

Ms. Robinson's second witness, Mr. Kramer, is an attorney at Mayer Brown LLP and a member of the D.C. Bar. Mr. Kramer represented Ms. Robinson "in a few different matters," including at least some related to the conduct for which she was disciplined, and had known Ms. Robinson for approximately eight years as of the time of the first hearing. He had the opportunity to observe her and "believe[d] that she does have remorse about the underlying misconduct" and that she had gained "a more complete understanding of what she did and what the problems are with the decisions she made" over the course of their relationship. For instance, he remembered her being "on the verge of tears and actually perhaps was in tears as she was sort of confronting the conduct in which she engaged" while being deposed. Based on his interactions with her, he characterized Ms. Robinson as "a kind and conscientious person who has learned from this experience" and told the committee "that she would be a credit to the bar." In the years since he stopped representing her, he acknowledged that their communication had become "sporadic"—though they "interacted . . . a little bit professionally" and had "exchanged Christmas cards and things like that." He had, for instance, observed Ms. Robinson's nonlegal work for a human-resource compliance consulting company she founded and incorporated after her law license was suspended, and the hearing committee found that "he

believed she was effective in providing meaningful information to her client and helping them assess how to proceed." Overall, Mr. Kramer testified that Ms. Robinson possessed the requisite fit character to be a member of the D.C. Bar.[9]

We reiterate that the hearing committee was clear that it credited the testimony of both witnesses. This is therefore not a situation in which we must exercise deference to the hearing committee's credibility determinations. Instead, the hearing committee's choice to place little weight on the witnesses' live testimony was predicated on its assessment of the nature of their relationships with Ms. Robinson and how frequently they interacted with her.

---

[9] Ms. Robinson also introduced into evidence a summary by the Wisconsin Office of Lawyer Regulation of a letter written by Leslie Haley, an attorney whom Ms. Robinson intended to call as a live witness, but who had a scheduling conflict that prevented her from appearing. The letter was submitted in support of Ms. Robinson's petition for reinstatement to the Wisconsin Bar, which was granted. *See supra* note 1. The summary indicated that Ms. Haley "strongly supported Robinson's reinstatement, stating that she had known Robinson quite well over the last six years; that Robinson has exhibited honesty and integrity; and that Robinson will never repeat any of her past behaviors or in any way prejudice or harm any of her future clients." In its post-hearing brief, ODC argued that because Ms. Haley "was not subjected to cross-examination or questioning by the Hearing Committee, her opinion about Ms. Robinson's present character should not be given any weight." We note that petitioners are not limited to live testimony, *see In re Kleppin*, 768 A.2d 1010, 1017 (D.C. 2001) (petitioner also offered letters and affidavits in addition to live testimony to show good character), though we assign less weight to non-live testimony.

But we have never held that a petitioner's live witnesses must know her in a personal (as opposed to professional) capacity, nor have we previously given dispositive weight to the frequency of their interactions—and we decline to take either step in this case. Doing so would place too high a burden on a petitioner to find a unicorn witness who has known her for a sufficiently long time, is aware of the details of her misconduct, speaks with her a certain number of times per year, and knows her in a personal capacity (in addition to or instead of in a professional capacity). We are instead concerned with the quality and nature of a witness's interaction with the petitioner, as that is what bears on that witness's ability to speak to the petitioner's present character. *Cf. In re Yum*, 187 A.3d at 1292-93 & n.2 (stating that a petitioner's live witnesses were insufficient to prove present character because they "were unfamiliar with the details of his misconduct"). Here, there can be no suggestion that Ms. Robinson's "character witnesses knew too few details of [the] misconduct to give their testimony much weight." *In re Alamgir*, 282 A.3d 81, 86 (D.C. 2022). In fact, here, the hearing committee determined that both witnesses were knowledgeable about the specific contours of Ms. Robinson's misconduct. And although neither witness was speaking with Ms. Robinson on a weekly or monthly basis at the time of their testimony, both witnesses were able to testify to Ms. Robinson's present character and represent that they did not believe she would violate the rules in the future, that she was a changed person who understood her

past transgressions, and that she would make a positive contribution to our Bar. That is enough for us to give weight to their testimony.

So too, Ms. Robinson offered other evidence of her post-discipline conduct showing her personal growth. She testified to her remorse, and the hearing committee credited that testimony. The hearing committee found that she had "completed numerous [CLE] courses focused on attorney ethics during the suspension period" in addition to "familiariz[ing] herself with attorney ethics societies and groups that can provide ongoing support to her." She introduced evidence showing that while suspended, she founded and incorporated the aforementioned consulting business and "fully disclosed her disciplinary history to [her consulting] clients"—alongside performing limited community service work, helping her teenage daughter with remote learning during the COVID-19 pandemic, and caring for her elderly mother. Though ODC points us to the hearing committee's characterization of her volunteer work as "sporadic and of a nature done by many people," both ODC and the hearing committee failed to consider the other evidence put forth by Ms. Robinson that bolsters our conclusion that she possesses the requisite "new determination to adhere to the high standards of integrity and legal competence." *In re Sabo*, 49 A.3d at 1232 (citation omitted).

Because we determine that the hearing committee's reasons for giving little weight to Mr. Daniels and Mr. Kramer's present-character testimony were legally erroneous, and because we conclude that their testimony showed her present fit character—strengthened by Ms. Robinson's own testimony and other evidence of her post-discipline conduct—we hold that she has met her burden on the present-character *Roundtree* factor.[10]

### III. Conclusion

For the foregoing reasons, we decline to adopt the hearing committee's recommendation and instead grant Ms. Robinson's reinstatement petition.

*So ordered.*

---

[10] That she met a similar burden in getting her Wisconsin license reinstated reinforces our determination. *See supra* note 1.