METROPOLITAN POLICE
DEPARTMENT, Petitioner,

v.

Ronald BAKER, Respondent.

No. 88-995.

District of Columbia Court of Appeals.

Argued July 17, 1989.
Decided Sept. 29, 1989.

---

** Associate Judge Mack has recused herself from participation in this case.

Susan S. McDonald, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellant.

J. Herbie DiFonzo, Washington, D.C., for appellee.

Before ROGERS, Chief Judge, and BELSON and SCHWELB, Associate Judges.

BELSON, Associate Judge:

This is a petition by the Metropolitan Police Department (MPD) for review of an Order of the Office of Employee Appeals (OEA). We agree with the MPD that it presented evidence sufficient to support the termination of respondent, Officer Ronald Baker, and that the contrary findings of OEA were unsupported by substantial evidence. Accordingly, we reverse.

An MPD adverse action panel upheld Officer Baker's termination for conduct unbecoming an officer in that he "knew or should have known" that his wife had placed large sums of embezzled money in the couple's bank accounts, some of which Baker converted to his own use.[1] Baker appealed to the OEA on the basis that he had been completely unaware of what his wife was doing. An OEA hearing examiner considered the MPD panel file, heard testimony from Officer Baker and his then wife, Wanda Baker, and then recommended that the MPD action be reversed on the ground that the MPD did not meet its burden of proof. An OEA reviewing panel adopted the recommendation of the hearing examiner and reversed the agency action.

The full OEA denied the MPD petition for review. The MPD then petitioned the Superior Court of the District of Columbia to review the OEA action. On denial of that petition, the MPD appealed to this court to review the OEA action.

The facts which underlie this case are largely undisputed, and in important part were the subject of a stipulation. We set them forth in some detail in light of our conclusion that they do not support the OEA findings. We emphasize that our holding here is not the result of different findings as to subsidiary facts, which are largely undisputed, nor is it based on a reevaluation of the credibility of the witnesses who testified before the hearing examiner. Rather, we hold that on the evidence before her the hearing examiner could not reasonably have concluded other than that Officer Baker should have known, or at least should have had strong enough suspicions to be obliged to find out, that his wife's illegal activities caused the presence of large sums of money in his bank account, and that it was that influx of illegal money that enabled Baker to add a deck to his house and acquire a new Ford pickup truck and a late model Chevrolet Corvette over a short period of time.

Appellee Ronald Baker served as an officer of the Metropolitan Police Department for fourteen years, commencing in 1964. In 1975 he married Wanda Baker, who worked as an accountant for the Washington Hospital Center. In May of 1979 Wanda Baker was arrested for embezzling funds in the amount of approximately $64,-000 from the hospital. Baker learned the reason for the arrest no later than several weeks thereafter. Wanda Baker began a new accounting job, at a reduced gross salary of $15,000 a year, in June of 1979 for an employer first called Capitol Reclamation Co. and later ECO Systems, and soon she began to embezzle there as well. The next month, Wanda Baker's mother, who managed her brother's estate with

---

1. The MPD's notice of proposed adverse action cited the following in charging appellee with conduct unbecoming an officer: "[v]iolation of General Order Series 1202, Number 1, Part I–F–12, which reads in part: 'Conduct unbecoming an Officer, which may include, in addition to acts detrimental to good discipline or tending to bring discredit on the force, violations ... of any law ... of the District of Columbia.'"

Wanda's help, discovered that her daughter had embezzled from the estate.

Shortly after her arrest for embezzlement, Wanda Baker opened three new bank accounts for herself and her husband. They included one joint checking account, one joint savings account, and an individual checking account for Officer Baker. There was a stark contrast between the couple's income during the ensuing period and the activity in those three accounts. Baker's take home pay was about $430 every two weeks, and Wanda Baker's was $432 every two weeks for a total of about $1,724 every four weeks. While Baker claimed that he had a second income during this period from employment with W. Bell & Company,[2] he also testified that he frequently worked for MPD from early in the morning until about midnight because of the many extra community projects in which he was involved. The record showed only the deposit of one small check from W. Bell. Officer Baker testified that he was paid by check for his work at W. Bell, but that he could cash the check there. He further testified that he gave his pay from W. Bell to Wanda Baker. The record does not reflect how she handled the funds after that. It is obvious from the record that the couple's living expenses absorbed virtually their entire take home income.[3] There was obviously little left for savings. After January of 1980, Wanda Baker was also required to reimburse the Washington Hospital Center the $64,000 she embezzled from it, at the rate of $8,000 per year.

Against this background of relatively limited income, Wanda Baker deposited a total of about $130,000 into the three newly opened accounts between June of 1979 and November of 1980. Of that total, she deposited $42,145 of ECO funds into her hus-

band's personal checking account between October of 1979 and April of 1980. During that same period, she deposited $87,738 of the above total into the Bakers' joint accounts, also from ECO funds.

During the period from October 16, 1979, and April 1980, Ronald Baker signed checks drawn on his personal checking account totaling $33,829.78. That figure contrasted with his take home pay from the MPD during that period of slightly in excess of $5,500 and a combined take home pay of the couple of less than $11,000. Of the more than $33,000 in checks that Baker signed, he wrote the entire check in at least $21,000 worth of them; he signed, but did not fill out, the remainder.

Wanda Baker presented Officer Baker with a gift of a new Ford pickup truck in November of 1979. Her testimony was that she added this new vehicle to the two they already owned, a Cadillac and a Pontiac Sunbird, without first asking Baker. She paid $5,000 down, and he soon paid almost an additional $1,000 for fees, taxes, tags, etc. It is not clear whether monthly installment payments ensued. When Baker received this gift in November of 1979, Wanda Baker had recently entered a plea of guilty and was awaiting sentencing for the Washington Hospital Center embezzlement.

In the period between May and December 1979, the Bakers added a deck to their house at a cost of $1,500 to $2,000 which Mrs. Baker said she paid out of their joint checking account.

Subsequently, in early April 1980, Baker purchased for himself a 1979 Chevrolet Corvette. His wife was along at the time of the purchase. His down payment was approximately $6,000. Again, the record fails to show the amount of monthly pay-

**2.** At first Officer Baker testified that his second job was with Giant Food. He later stated that he worked for W. Bell for at least ten months after June 1979 before he took a higher paying position at Giant. Officer Baker testified that he received permission from the MPD for his outside job at W. Bell as well as the later job with Gian Food. He later stated that his employment with W. Bell predated the MPD requirement that outside jobs be approved. The

MPD investigation revealed no requests by Officer Baker for approval of outside employment.

**3.** Their acknowledged expenses included $510 per month for mortgage, $60 per month for food (Wanda Baker's estimate), and $320 monthly for car payments on her Cadillac and his Pontiac Sunbird. There were also unspecified amounts paid monthly for the operation of the two vehicles, utilities, household expenses, clothing, entertainment, etc.

ments that ensued, but in this case they were obviously substantial. Baker testified that he bought the Corvette with a combination of a tax refund in the amount of $3,500 and money which he had saved out of his income since the previous June.

The issue of whether Officer Baker had ever questioned his wife as to the source of their automotive affluence was not resolved by the hearing examiner. Wanda Baker testified that Officer Baker never asked her about any of the purchases. Officer Baker contradicted her, indicating that she explained that various purchases were funded by loans from members of her family.

Officer Baker testified that his wife managed all of their finances and that he regularly signed blank checks for her and did not look at bank statements. He stated that he would not look at bank statements even if she showed them to him, and that he was never aware of the balance in his personal account. He chose instead to ask his wife whether there was enough money in the account to cover a given purchase. Wanda Baker testified that Officer Baker regularly left signed, blank checks for her, and that when Officer Baker would ask her about his account balance "I would tell him what his balance was. It might not have been an accurate figure and I know for a fact that it was never an accurate figure." [Tr. at 25–26] [4]

In November of 1980 Wanda Baker was once again arrested for embezzlement. In 1982 Officer Baker was indicted in Prince Georges County on charges including conspiracy and accessory after the fact, and the MPD suspended Officer Baker indefi-

nitely pending the outcome of his criminal case. Wanda Baker pled guilty to one count of the indictment against her [5] and again received a suspended sentence.[6] Officer Baker was first convicted by a jury, but won a reversal because of an instructional error regarding character testimony, and ultimately was acquitted in a bench trial. Following the criminal proceedings, the MPD gave Officer Baker notice of its proposal to terminate for "conduct unbecoming an Officer," namely that he knew or should have known of his wife's illegal activities and that he knowingly benefited from her misdeeds.

After an evidentiary hearing before an MPD adverse action panel that found Baker's assertion of ignorance incredible,[7] he was informed in August 1984 that the MPD had determined that it would terminate his employment. Officer Baker then appealed his dismissal to the (OEA). [Supplemental Record 1, Tab 3] OEA held an evidentiary hearing at which the only witnesses were Officer Baker and Wanda Baker. Because of the unavailability of the investigating officer, the MPD presented no witnesses at the OEA hearing.

The hearing examiner stated that she found Baker's

testimony believable for several reasons. First, Agency has failed to show that Employee's purchases were extreme or lavish for a person who worked two jobs. Secondly, since Employee was working two jobs it is conceivable that Employee would have had less opportunity to become aware of Mrs. E's criminal activity. Thirdly, while Employee's actions might show some naivety [sic] on his part, it is

---

**4.** "Tr." refers to the 104 page transcript of the July 31, 1986 OEA hearing before Hearing Officer Wanda L. Jackson, included at Tab 17 of *Supplemental Record 1.*

**5.** The prosecutor did not prosecute the other counts.

**6.** Wanda Baker was later sentenced to serve a term in prison for another crime against yet another employer, the National Science Foundation.

**7.** The panel found appellee's explanation "beyond belief." [Supplemental Record 1, Tab 2 at 10] "Any reasonable person faced with *the total*

*picture* of this large money flow would conclude that his wife could not be the legal benefactor of this money. Especially when considering her history of embezzlement which was known to [appellee] at the time these deposits were being made into his accounts." *Id.* at 11 (emphasis added). The panel did not accept appellee's defense that he had been duped into accepting the explanations of Wanda, a pathological liar and thief, and found "that [appellee] did in fact, know or should have known that this money he was receiving was of an illegal origin." *Id.*

not unusual for one spouse to manage the checking account for both of them, especially as in this case where one spouse's background is in accounting. Further, Agency has presented no evidence to convince this Examiner that Employee had reason to know of his wife's criminal activity.

Hearing Examiner's Recommended Initial Decision at p. 6.

In denying the MPD petition for review of the hearing examiner's findings), the Chair of the OEA noted that the hearing examiner had amply supported her findings:

First, the examiner noted that the family finances, including the management of all three bank accounts, were handled entirely by Mrs. [Baker]. Second, Mrs. [Baker] never told [Officer Baker] how much money was truly in the accounts and [Officer Baker] never saw the bank statements. Third[,] [Officer Baker] worked two jobs and had little time to discover his wife's criminal activities. Finally, the purchases, which Agency argued should have made [Officer Baker] aware of his wife's activities, were not extreme when compared with the total family income.

The MPD next petitioned the Superior Court for review pursuant to D.C. *Code* § 1–606.1(d) (1987 Repl.) and Super.Ct. Civ.R., Agency Review 1(a) (1988). The court did not hear argument, but entered a memorandum order denying the petition for review.

In reviewing an agency decision, the Superior Court "shall base its decision exclusively upon the administrative record and shall not set aside the action of the agency if supported by substantial evidence in the record as a whole and not clearly erroneous as a matter of law." Super.Ct.Civ.R., Agency Review 1(g) (1988). Our scope of review on an appeal from the action of the Superior Court in reviewing the OEA decision "is precisely the same as that which we employ in cases that come directly to this court." *Stokes v. District of Columbia*, 502 A.2d 1006, 1010 (D.C.1985). We review the administrative record " 'to de-

termine whether there has been procedural error, whether there is substantial evidence in the record to support the OEA's findings, or whether the OEA's action was in some manner otherwise arbitrary, capricious, or an abuse of discretion.' " *District of Columbia Metropolitan Police Department v. Broadus*, 560 A.2d 501, 504 (D.C. 1989) (quoting *Stokes v. District of Columbia, supra*, 502 A.2d at 1010). "Agency findings of fact must be affirmed if 'supported by and in accordance with reliable probative and substantive evidence in the record as a whole.' " *Id.* (quoting *Jones v. Police and Firemen's Retirement and Relief Board*, 375 A.2d 1, 5 (D.C.1977)). In reviewing the OEA, we give great deference to any credibility determinations of the administrative factfinder. *Gunty v. District of Columbia Dep't of Employment Servs.*, 524 A.2d 1192, 1197 (D.C. 1987). If the administrative findings are supported by substantial evidence, we must accept them even if there is substantial evidence in the record to support contrary findings. *Baumgartner v. Police and Firemen's Retirement and Relief Board*, 527 A.2d 313, 316 (D.C.1987). In this case, even after taking into account the high standard for reversal of an agency determination, we hold that the OEA findings and conclusions cannot stand as they are unsupported by evidence in the record as a whole.

Under OEA rules, the MPD had the burden of proving by a preponderance of the evidence that Officer Baker either knew or should have known of his wife's renewed embezzlement. OEA Rule 614.3, 27 D.C.R. 4361 (1980). The hearing examiner found that the MPD had not met this burden. Our role here is not to second guess the examiner's credibility determinations. However, this case actually turns not on determinations of witness' credibility but rather on what inferences can reasonably be drawn from undisputed facts concerning Baker's income and expenditures.

While we must affirm if the OEA's findings are supported by substantial evidence, this court has held that evidence is not substantial if it is "so 'highly questionable

in the light of common experience and knowledge' that it [is] unworthy of belief." *District of Columbia General Hospital v. Office of Employee Appeals*, 548 A.2d 70, 77 (D.C.1988) (citing *Jackson v. United States*, 122 U.S.App.D.C. 324, 329, 353 F.2d 862, 867 (1965)).

Analysis of the reasons the hearing examiner gave for accepting the testimony of Officer Baker demonstrates that her findings were not based upon her ability to see the witnesses and assess their demeanor. The examiner's first reason for crediting Baker was that the agency had failed to show that the employee's purchases were extreme or lavish for a person who worked two jobs. Our above description of the Baker family's financial situation including Baker's vague showing of a negligible second income shows why that is incorrect. The examiner relied secondly on her perception that it was conceivable "that Baker would have had less opportunity to become aware of his wife's criminal activity because he was working two jobs." The record is clear, however, that Baker was well aware that Wanda Baker was under indictment for a major embezzlement from the Washington Hospital Center, and he accompanied her to her sentencing for that offense before the purchase of the Corvette. The examiner also noted that it is not unusual for one spouse to manage the checking account for both parties to a marriage, especially when one spouse has a background in accounting. This observation is true as far as it goes, but it overlooks the unusual fact that Baker knew Mrs. Baker was an embezzler. The examiner's final basis for crediting Baker's account was that the MPD had presented no evidence to convince her that the employee had reason to know of his wife's criminal activity. This is flatly contradicted by the record so far as the hospital embezzlement was concerned, and that embezzlement put Baker on notice of the possibility of further irregularities.

Even assuming that Wanda Baker testified truthfully that she never told her husband about her renewed embezzlement and that he accepted her explanations about some extra money coming from her family, the undisputed facts required the finding that Officer Baker should at least have suspected that his wife was using embezzled funds when the couple made two large purchases in a period that she described as one of financial difficulty. Even allowing for some income from a second job to supplement Officer Baker's income (for which the evidence is minimal) and a large income tax refund, the amount of money coming into the Baker household could not possibly have covered the vehicular purchases, given the level of the couple's fixed expenses.

It more than strains credulity that a married couple could buy a new Ford pickup truck and a nearly new Chevrolet Corvette and add a deck to their home in a period of a few months, while keeping up payments on two other cars and incurring the usual living expenses experienced by a middle class working couple, without pushing family finances over the edge. It would seem unreasonable for a spouse in Baker's position not to do so much as to look at a bank statement or verify a bank balance under the circumstances; either of those steps would have enlightened him. But when one adds to these circumstances the fact that when these luxury purchases were being made, Baker's wife was facing charges for embezzlement of $64,000, and had secured new employment in another position that might give her access to an employer's funds, it is patent that Baker should have suspected, if he did not actually know, what was going on. It is fair to say that any reasonable person, not just a person with training as a police officer, would have felt obliged to see where the money was coming from.

In order to reverse the OEA determination, we need not find that Officer Baker actually knew of or participated in his wife's criminal activity. The evidence on the record before the OEA hearing examiner does not entirely rule out the possibility that he was the innocent, but unreasonably credulous, prey of a clever manipulator. However, we hold that the evidence did not permit the factfinder to conclude other than that the unique combination of circumstances with which Officer Baker was

faced was such as to require a reasonable person to inquire more vigorously into the source of funds for the large vehicular purchases. Our review of the evidence presented to the OEA hearing examiner convinces us that the only tenable view of the record was that the MPD met its burden of establishing that Officer Baker should have known something was amiss, and that he conducted himself in an unacceptable manner in enjoying the benefits of the car purchases without taking the simple step of checking a bank statement or bank balance.

Finally, we observe that respondent has never challenged the implicit assumption apparently made by all who took part in these proceedings that if Baker knew or should have known that his wife was putting embezzled funds into their bank accounts and enjoyed the benefits of money taken from those accounts, that behavior would amount to conduct unbecoming an officer.[8] It is clear beyond question that such conduct on the part of an officer, whether or not it was provably in violation of any law of the District of Columbia, would tend to bring discredit upon the Metropolitan Police Department.

Accordingly, we reverse the judgment of the Superior Court, and remand this case to the Superior Court for the entry of an appropriate order.

*Reversed and remanded for the entry of an order of judgment consistent with this opinion.*

---

8. See footnote 1, *supra.* By his own testimony, Baker suggested that he was aware that his wife's derelictions might affect his position at the MPD. "I said 'look, if you love me, please don't steal nothing because that's detrimental to my job.' I said that's a reflection on me."