**In re Byron C. WELLS, Applicant.**

**No. 02–BG–1112.**

District of Columbia Court of Appeals.

Jan. 30, 2003.

Before SCHWELB and WASHINGTON, Associate Judges, and NEBEKER, Senior Judge.

PER CURIAM:

Applicant, Byron C. Wells, admitted making unwanted sexual advances to between ten and twenty young male clients in the mid–1980s. In 1987, he was arrested and charged with five counts of battery. Pursuant to a plea agreement, Wells admitted committing one count of misdemeanor battery, and the prosecution dismissed four of the counts and agreed to withhold prosecution with respect to the remaining count, subject to Wells' participation in a pretrial diversion program. Wells successfully completed the diversion program, and the remaining count was dismissed.[1]

As a result of his misconduct, the Supreme Court of Indiana suspended Wells from the practice of law for three years with a fitness requirement. *In re Wells,* 572 N.E.2d 1290 (Ind.1991) (per curiam), *cert. denied,* 522 U.S. 864, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997). Wells has twice sought and been denied reinstatement in Indiana. He now seeks admission to the bar of the District of Columbia. A three-member majority of the Committee on Admissions ("the Committee") recommends that we grant Wells admission to the bar. Two members dissented in an opinion written by the Committee's Chairman, Richard B. Nettler, Esquire. The Committee's majority and dissenting opinions are attached hereto.

When evaluating applications for admission to the bar, we afford some deference to the Committee's recommendations, making "due allowance for the Committee's opportunity to observe and evaluate the demeanor of the applicant where relevant, *e.g.,* with regard to such attitudes as sincerity or remorse." *In re Manville,* 494 A.2d 1289, 1293 (D.C.1985). In this case, however, the Committee members are sharply divided in their assessments of Wells' understanding of the wrongfulness of his conduct and his acceptance of responsibility for his actions. We consider that disparity when assessing the Committee's recommendation, keeping in mind that "the ultimate decision regarding admission or denial of admission remains for this court to make." *Id.* Moreover, we find it persuasive that the Supreme Court of Indiana has twice denied reinstatement, and has unanimously concluded with respect to Wells' most recent petition that

[t]he misconduct leading to the petitioner's suspension was grave. He used his advantage, power and control to attempt to inappropriately incite sexual relations with young men, some of whom had come to the respondent to seek his professional assistance. We have stated that the more serious the attorney misconduct, the greater its negative impact on future rehabilitation and eventual reinstatement and, accordingly, the greater the petitioner's burden of proof to overcome the implication of unfitness which is conjured by the misconduct. In the present case, our concerns about the sincerity of the petitioner's remorse and the integrity of his attitude towards and understanding of the standards imposed upon members of the bar, coupled with the severity of his misconduct, outweigh the evidence he presented concerning his rehabilitation and present fitness to practice law.

---

1. Wells was arrested in 1990 on two additional charges of battery, but was acquitted of those charges by a jury.

*In re Wells*, 572 N.E.2d 1290 (Ind. 1991) (citation omitted). As in reciprocal discipline cases, we give great deference to the Indiana Supreme Court's decisions, for Indiana is Wells' jurisdiction of original admission.[2]

Substantially for the reasons stated in Mr. Nettler's persuasive dissent, we conclude that Wells has failed to meet the burden imposed on him by D.C. Ct.App. R. 46(e) of establishing by clear and convincing evidence that he presently possesses the good moral character required in order to practice law in this jurisdiction. Accordingly, we deny Wells' application for admission to the bar of the District of Columbia.

*So ordered.*

WASHINGTON, Associate Judge, dissenting:

I respectfully dissent from my colleagues' decision to deny Wells' application for admission to the bar of the District of Columbia. The Committee on Admissions' majority appropriately applied the *Manville*[3] factors and concluded that Wells satisfactorily demonstrated his good moral character and fitness to practice law. "In reviewing the Committee's determination that an applicant has met that burden, and its accompanying recommendation for admission, this court will accept findings of fact made by the Committee unless they are unsupported by substantial evidence of

record ..." *In re Kleppin*, 768 A.2d 1010, 1011 (D.C.2001) (internal quotation and citation omitted). I am unable to conclude that the Committee majority's findings regarding Wells' rehabilitation lack evidentiary support in the record. At the same time, I believe the minority opinion relies too heavily on its supposition that Wells' suggestion of unfair treatment by the Supreme Court of Indiana is evidence of a lack of rehabilitation or lack of acknowledgment of wrongdoing.[4] Accordingly, I respectfully dissent.

## ATTACHMENT

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 02–BG–1112

IN RE:

BYRON C. WELLS, E29513

An Applicant for Admission

to the District of Columbia Bar.

Filed October 8, 2002

District of Columbia

Court of Appeals

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND RECOMMENDATION OF THE COMMITTEE ON ADMISSIONS

Byron C. Wells (the "Applicant") has applied to become a member of the Bar of

---

2. Because the ultimate decision rests with this court, and the question of sufficiency of evidence of good moral character under the clear and convincing standard is ultimately one of law, we cannot agree with our dissenting colleague's conclusion in this case.

3. *In re Manville*, 494 A.2d 1289, 1293 (D.C. 1985).

4. The fact is that the Indiana Supreme Court Disciplinary Commission unanimously recommended that Wells be reinstated both times he applied for reinstatement. In denying reinstatement, the Supreme Court of Indiana re-

lied in part on the seriousness of Wells' misconduct. However, if his misconduct was as egregious as the Court now appears to believe, it could have disbarred him in 1991 rather than suspending him with a fitness requirement. For these reasons, I place less weight than do my colleagues on the Supreme Court of Indiana's denials of reinstatement. I find it significant that the hearing bodies of both jurisdictions, having had the opportunity to personally observe and evaluate Wells, each concluded that he possesses the requisite moral character to practice law.

the District of Columbia (the "Bar"). The Applicant passed the February 1996 bar examination, after having failed the July 1995 exam. However, the Applicant had been suspended from the practice of law by Indiana based upon charges relating to incidents between 1985 and 1987 in which he allegedly made unwanted sexual advances on several male clients. The application for admission to the District of Columbia Bar was held in abeyance pending review by the Supreme Court of Indiana of the Applicant's second request for reinstatement to that state's bar and pending a formal hearing on the application by the Committee on Admissions of this Court (the "Committee"). On May 6, 1998, the Committee conducted a formal hearing on the application pursuant to D.C.App. R. 46(f). At the request of the Committee, Mr. Wells supplemented the record on July 15, 2002. A majority of the voting members of the Committee now finds that the Applicant has demonstrated his rehabilitation by clear and convincing evidence and, accordingly, that he possesses the requisite good moral character and general fitness to practice law.[5] Therefore, the Committee recommends that the Applicant be admitted to the District of Columbia Bar. A separate dissenting report by a minority of the Committee, is appended and has been filed simultaneously herewith.

### Findings Of Fact

The Applicant is a former member of the Indiana Bar and a former judge of the Shelby County, Indiana Court, having served from 1977 through 1983. He was born in 1943. After serving as a reporter for the Indianapolis Star from 1965 until 1977, he received his Juris Doctor degree from Indiana University in 1977. On December 12, 1990, he was suspended from practice in Indiana for three years (*In re Wells,* 572 N.E.2d 1290 (Ind.1991)) (R. 52–59),[6] and he was twice denied readmission by the Indiana Supreme Court.

The circumstances surrounding the Applicant's suspension from the Indiana Bar are as follows. After leaving the Shelby County Court bench in 1984, the Applicant opened a private law practice. According to the Applicant, he began making unwanted sexual advances toward certain male clients. The Applicant explained that he was overworked and his marriage, which included two children and four grandchildren, was suffering. The Applicant testified that he did not approach any male clients who were not of legal age. (R. 966–967). The Applicant explained that he approached a number of young males and would touch them to determine if they were interested in a sexual relationship. At the hearing before the Committee, the Applicant further testified that he "never used coercion, threats, intimidation [or] tried to talk anybody into anything. It was just a simple sexual pass . . . ." (R. 968; *see also* R. 56).

In 1987, the Applicant was arrested and charged with five counts of battery, the details of which were spelled out in a Verified Complaint for Disciplinary Action. (R. 26–27). At the hearing before the Committee, the Applicant stated that his sexual activity was revealed by a former client with whom he had a sexual relation-

---

5. The Committee members in favor of admission are Messrs. Carlin, Hyman, and Kent. Former Committee members Gere and Ludaway, both of whom participated in the proceedings and deliberations, also favor admission.

6. The Committee's record will be cited herein as "R.", followed by the relevant page number.

ship when that individual offered to testify against the Applicant in order to obtain a more lenient sentence following the former client's arrest for burglary. (R. 958).[7] In June 1988, the government dismissed four of the battery counts and filed an agreement to withhold prosecution with respect to the remaining misdemeanor battery count subject to the Applicant's participation in a diversion program. (R. 56). The Applicant completed the program and on September 6, 1988, the remaining charge was dismissed pursuant to the agreement. (*Id.*).

The Indiana Supreme Court Disciplinary Commission instituted disciplinary proceedings against the Applicant in 1989. (R. 26–27). In December 1990, the Indiana Supreme Court suspended the Applicant from practice pending further court order. (R. 52–53).[8] In July 1991, the Indiana Supreme Court suspended the Applicant from practice until December 12, 1993, at which time he would become eligible for reinstatement subject to satisfying the Court's rules for readmission. (R. 54–59).

The Applicant sought reinstatement in the Indiana Bar from the Indiana Supreme Court in 1994. (R. 60–63). A Hearing Officer, Sherrill William Colvin, conducted a lengthy proceeding that included the presentation of witnesses and other evidence regarding the Applicant's actions and his character and fitness for reinstatement in the Indiana Bar. (R. 65–81). During the reinstatement hearing, the Applicant testified that he understood his ac-

tions were wrong, expressed remorse for those actions and that he had been receiving counseling to address those actions. At the conclusion of the hearing, the Hearing Officer issued detailed Findings of Fact and Conclusions of Law and recommended that the Applicant be readmitted to the Bar. *Id.* On August 15, 1994, the four members of Indiana Supreme Court Disciplinary Commission accepted the Hearing Officer's recommendation and unanimously recommended that the Applicant be readmitted to the practice of law in Indiana. (R. 64).

On September 29, 1994, the Indiana Supreme Court denied reinstatement, despite both the Hearing Officer's recommendation of re-admission and the Indiana Supreme Court Disciplinary Commission's adoption of that recommendation after review of the record. (R. 82). In a one-page order, the Indiana Supreme Court stated that it was not convinced that Mr. Wells:

has a proper understanding of and attitude towards [sic] the standards that are imposed upon members of the bar and that he will conduct himself in conformity with such standards.

*Id.*[9]

In 1996, while his application for admission to the Bar was pending in the District of Columbia, the Applicant again sought reinstatement in the Indiana Bar from the Indiana Supreme Court. In connection with those reinstatement proceedings, the Applicant submitted expert testimony by Dr. John C. Ehrmann, Jr., a clinical psychologist, who was selected by the Indiana

---

7. The Applicant testified that he assumed that the disciplinary action against him in Indiana did not include this relationship as a basis for discipline because the relationship with the client was consensual. (R. 960).

8. In December 1990, while those disciplinary proceedings still were pending before the

Indiana Supreme Court, the Applicant was arrested on two additional charges of battery. He was acquitted of those charges by a jury on July 3, 1991. (R. 163–166).

9. Justice Givan dissented and would have granted reinstatement. *Id.*

Disciplinary Commission to evaluate the Applicant. (R. 637–640).[10] In June 1996, Dr. Ehrmann opined that:

> Psychologically [the Applicant] has accomplished, in my opinion, the necessary steps to result in attitude change and self-acceptance. Some of the underlying dynamics which contributed to his earlier difficulties have long since been faced and dealt with.

(R. at 639). Dr. Ehrmann further stated that:

> In an overall sense, Mr. Wells presents a treatment history and current profile which are consistent with an exceedingly positive prognosis regarding both his psychological functioning and his ability to interact with others in the future, even as a practicing professional, without posing any form of threat to them. I see him as an extremely low risk for any offense similar to that for which he was previously charged. In my extensive experience, there are few in [Applicant's] position who have invested the degree of effort and energy in addressing their problems and maintaining ongoing professional support. In addition, [Applicant] has involved himself in a voluntary position in an effort to help others with problems. He has earned the respect of therapists and his pastor as well. These individuals appear to have been in a position to assess [Applicant's] progress both professionally and from a community standpoint. He is clearly endorsed very positively by these individuals.

*Id.*

Janet Watson, a therapist of the Wellness Center of Holy Trinity Community Church in Memphis, Tennessee and also an AMSW and ALCSW, concurred in that conclusion. (R. at 641–643).

In July 1996, a second Hearing Officer, Julia Blackwell Gelinas, conducted another lengthy reinstatement proceeding with witnesses and documentary evidence. (R. at 774). Again, the Hearing Officer issued detailed Findings of Fact and Conclusions of Law. (R. 772–781). Again, the Hearing Officer recommended that the Applicant be reinstated in the Indiana Bar. *Id.* at 781. A second Indiana Supreme Court Disciplinary Commission comprised of eight individuals received and reviewed the voluminous record and unanimously recommended reinstatement. (R. at 771). As with the 1994 reinstatement proceedings, there was no dissent from the Disciplinary Commission's recommendation that the Applicant be reinstated in the Indiana Bar.

However, in December 1996, the Indiana Supreme Court again rejected the Disciplinary Commission's unanimous recommendation of reinstatement and denied the Applicant's Petition for Reinstatement. In a brief opinion, the Indiana Supreme Court concluded that:

> our concerns about the sincerity of the petitioner's remorse and the integrity of his attitude towards [sic] and understanding of the standards imposed upon members of the bar, coupled with the severity of his misconduct, outweigh the evidence he presented concerning his rehabilitation and present fitness to practice law.

(R. 860–863).

This Committee conducted an investigation to determine whether the Applicant

---

10. In connection with his 1994 application for reinstatement, Applicant submitted similar expert testimony from Linda Merritt, M.S., a psychologist, whom he saw weekly for over two years. *See, e.g.,* R. 374–375. Ms. Merritt testified that, in her professional opinion, the Applicant was aware of the standards that are imposed on members of the Bar and would conduct himself in conformity with those standards in the future. *Id.* at 375.

presently possesses good moral character and general fitness to practice law in the District of Columbia. *See In re Manville,* 494 A.2d 1289 (D.C.1985) (*"Manville I"*). The Committee also had before it the voluminous record relating to the Indiana proceedings. The Committee held a formal hearing on May 6, 1998 at which the Applicant appeared personally, with two supporting witnesses.

### Analysis And Conclusions Of Law

Applicants for admission to the District of Columbia Bar must demonstrate, by clear and convincing evidence, that they possess "good moral character and general fitness to practice law." D.C.App. R. 46(e). Because of the Applicant's criminal record, the Committee evaluates his application in accordance with the Court of Appeals' *Manville* decisions: *In re Manville,* 494 A.2d 1289 (D.C.1985) (*"Manville I"*) and *In re Manville,* 538 A.2d 1128 (D.C.1988) (*"Manville II"*), and their progeny.[11]

Taken together, the *Manville* decisions hold that prior criminal convictions do not necessarily disqualify a bar Applicant on character and fitness grounds. Instead, the Court considers an Applicant's present moral character and fitness and permits the Applicant to be admitted upon sufficient proof of the Applicant's "full and complete rehabilitation." *Manville I,* 494 A.2d at 1295–96 (quoting *Application of Davis,* 38 Ohio St.2d 273, 313 N.E.2d 363, 364 (1974)); *Manville II,* 538 A.2d at 1132.

In cases such as this one, the Court of Appeals consistently has balanced the seriousness and length of an Applicant's misconduct against the positive evidence of the Applicant's character over an extended period of time. *See, e.g., Manville I* and *Manville II,* both *supra; In re Sobin,* 649 A.2d 589 (D.C.1994); *In re Polin,* 630 A.2d 1140 (D.C.1993) (*"Polin II"*). *Manville I* identified eleven non-exclusive factors to be evaluated in assessing the character and fitness of Applicants with criminal records. As discussed below, the Committee has considered each of those factors in arriving at its recommendation in this matter. Bases upon the entire record, a majority of the Committee is satisfied that the Applicant is fully and completely rehabilitated. Accordingly, the Committee recommends that the application be granted.

*Manville I* requires us to consider eleven non-exclusive factors in deciding whether the Applicant has established his "full and complete rehabilitation." *Manville I,* 494 A.2d at 1295–1296, quoting *Application of Davis,* 313 N.E.2d at 364. We do not engage in a mechanical weighing of these factors, but treat them as guides to decide whether "the duration and quality of [his] good behavior suffices to establish present good moral character." *Polin II,* 630 A.2d at 1141. The eleven non-exclusive factors set forth in *Manville I* are:

(1) The nature and character of the offenses committed;

(2) The number and duration of the offenses;

(3) The age and maturity of the applicant when the offenses were committed;

(4) The social and historical context in which the offenses were committed;

(5) The sufficiency of the punishment undergone and restitution made in connection with the offenses;

(6) The grant or denial of a pardon for the offenses committed;

---

11. As discussed above, ultimately the government dismissed the criminal charges against the Applicant. The Committee nonetheless evaluates the Applicant's request for admission to our Bar under the *Manville* standard to demonstrate that, even under a higher standard, the Applicant meets the requirements for admission.

(7) The number of years that have elapsed since the last offense was committed, and the presence or absence of misconduct during that period;

(8) The applicant's current attitude about the prior offenses (*e.g.*, acceptance of responsibility for and renunciation of past wrongdoing, and remorse);

(9) The applicant's candor, sincerity, and full disclosure in the filings and proceedings on character and fitness;

(10) The applicant's constructive activities and accomplishments subsequent to the criminal convictions; and

(11) The opinions of character witnesses about the applicant's moral fitness.

*Manville I,* 494 A.2d at 1296–1297. The Committee's findings and conclusions with respect to the *Manville* factors are set forth below.

### 1. The Nature and Character Of The Offenses Committed.

As described above, the Applicant admitted to one count of misdemeanor battery in 1987 and participated in a diversion program. Ultimately, in 1988 all charges were dismissed pursuant to agreement with the government.

### 2. The Number And Duration Of The Offenses.

The Applicant's criminal conviction was based upon his plea of guilty to one count of a five count charge. The Applicant admits that he made unwanted sexual advances toward more than one client during the relevant time period of 1985 to 1987. Although the Applicant was charged with additional conduct emanating from this time period, he was acquitted of those charges by a jury. The Applicant committed no crimes before or after this time period, some 15 years ago.

### 3–4. The Age And Maturity Of The Applicant When The Offenses Were Committed And The Social And Historical Context In Which The Offenses Were Committed.

The Applicant was in his mid–40's at the time of his misconduct. He had been a trial judge for seven years and a practicing attorney in his own firm for three years. We conclude that while the Applicant was of sufficient age and maturity to appreciate the wrongfulness of his conduct, he was going through a difficult time in his marriage and in accepting and acknowledging his sexual orientation. The Applicant has received professional counseling and treatment in connection with the stresses in his personal life. As noted by Dr. John C. Ehrmann, the clinical psychologist appointed by the Indiana Supreme Court Disciplinary Committee to examine the Applicant, the Applicant has taken "the necessary steps to result in attitude change and self-acceptance." (R. at 639). The underlying dynamics that had contributed to the Applicant's earlier difficulties "had long since been faced and dealt with." *Id.* Other experts, described above, concurred in Dr. Ehrmann's conclusion. *See also* (R. at 940–941).

### 5. The Sufficiency Of The Punishment Undergone And Restitution Made In Connection With The Offense.

Pursuant to agreement with the government, the Applicant participated in a diversion program, which he completed. In the Committee's view, the participation in that program and the pendency of criminal charges for over a year while completing the program were sufficient punishment to satisfy the community's interests in retribution and deterrence. There is no issue of restitution as there was no financial loss. Of some note in this regard is the fact that two of the three individuals involved in the charges giving rise to the

Indiana suspension from practice against the Applicant later sought out the Applicant to represent them in connection with other criminal charges against them. Because of the pending disciplinary charges in which these clients were witnesses, the Applicant declined to represent them. (R. at 968).

### 6. The Grant Or Denial Of A Pardon For The Offenses Committed.

The Applicant has neither sought, nor has been granted, a pardon.

### 7. The Number Of Years That Have Elapsed Since The Last Offense Was Committed, And The Presence Or Absence Of Misconduct During That Period

It has been 15 years since the Applicant's criminal charge. The Committee is not aware of any subsequent misconduct. The substantial length of time since the Applicant engaged in any criminal misconduct militates in favor of his admission to this Bar.

The Applicant's 15 years of lawful and responsible conduct since his criminal offense in 1987 compares favorably with other applicants who have been admitted after demonstrating shorter periods of rehabilitation. In *Polin II*, 630 A.2d 1140 (D.C.1993), an applicant with a conviction for felony conspiracy to distribute cocaine was admitted to the Bar. When evaluated by the Committee, Polin had been "free of

drugs for eight years, and free from court supervision for nearly six." *Id.* at 1144 (quoting the Committee's report in the Appendix to the case, which the Court adopted. *See id.* at 1142). *See also In re Sobin*, 649 A.2d 589 (D.C.1994) (applicant demonstrated good moral character despite criminal conduct occurring over 10 years earlier.)

### 8. The Applicant's Current Attitude About His Prior Offenses (Eg., Acceptance Of Responsibility For And Renunciation Of Past Wrongdoing And Remorse).

The Applicant has accepted responsibility for his wrongful conduct. For the last decade or more, the Applicant has repented for his conduct through word and deed. He successfully has undergone professional counseling. The Applicant stated during the Hearing before the Committee that he will not repeat the conduct with which he originally was charged. The Applicant assumes full responsibility for his acts between 1985 and 1987 and recognizes that those acts are not acceptable for any attorney in connection with a professional representation.

It is the Committee's conclusion that the Applicant has demonstrated the sufficiency of his acceptance of wrongdoing and his satisfactory rehabilitation.[12] Moreover, since that time, the Applicant has been employed gainfully (R. at 953–955), and has supervised other employees without any complaint. (R. at 1013–1015).

---

12. This Committee reaches its conclusions *de novo* based upon the evidence before it. There is no requirement or precedent for the Committee to adopt or accept without further scrutiny the conclusion of another court or disciplinary authority with respect to admission to this Bar. *See, e.g., In re Blair*, 614 A.2d 523, 527 (D.C.1992). Ultimately, the District of Columbia Court of Appeals determines whether an applicant should be admitted to practice law in the District of Columbia. *In re Baker*, 579 A.2d 676, 680 (D.C. 1990).

### 9. The Applicant's Candor, Sincerity And Full Disclosure In The Filings And Proceedings On Character And Fitness.

The Applicant was ·cooperative, forthright, sincere and respectful in his testimony and demeanor before this Committee.

### 10. The Applicant's Constructive Activities And Accomplishments Subsequent To His Criminal Conviction.

The Applicant has been employed gainfully. He also has contributed to his community including fund raising and support for various AIDS and other health-related organizations and causes. (R. at 998–1001). The Applicant also has been active in his church and its affiliated Wellness Center. (R. at 981–983). The Applicant's community service is laudable evidence of his rehabilitation.

### 11. The Opinions Of Character Witnesses About The Applicant's Moral Fitness.

With his application, the Applicant submitted letters from many character references. (R. 1125, 1136–1155). All spoke to his good character and recommended his admission to the Bar. Two members of the Applicant's church in Memphis, Tennessee, Gerald Wright and Herbert Murray, traveled to Washington and testified before the Committee. Messrs. Wright and Murray were knowledgeable about the Applicant's criminal record. They, nonetheless, attested to the Applicant's good character and fitness to practice law. (R. at 1030–1087). The Applicant also testified that he continues to enjoy the support of his two grown children who are aware of his problems with the law and the Bar. (R. at 1011). We credit the Applicant's reference letters and those who spoke on his behalf before this Committee.

### Conclusion And Recommendation

The Committee has considered all the circumstances of this case and has weighed them against the *Manville* factors. A majority of the voting members of the Committee concludes that the Applicant has demonstrated his full and complete rehabilitation and that he has the requisite good moral character and general fitness to practice law. The Committee, therefore, recommends his admission to the District of Columbia Bar.

Respectfully submitted,

/s/ Mark S. Carlin

Mark S. Carlin
Vice Chairman
Committee on Admissions
500 Indiana Avenue NW, Room 4200
Washington, D.C. 20001
202/ 879-2710

### DISTRICT OF COLUMBIA COURT OF APPEALS

No. 02–BG–1112

IN RE:

BYRON C. WELLS, E29513,

An Applicant for Admission

District of Columbia

to the District of Columbia Bar.

Filed October 8, 2002

District of Columbia

Court of Appeals

### DISSENT FROM THE RECOMMENDATION OF THE COMMITTEE ON ADMISSIONS

A majority of the Committee on Admissions has recommended that the Court grant the petition of Byron C. Wells for admission to the Bar of the District of Columbia. For the reasons stated below,

a minority of the Committee [1] respectfully dissents.

As stated in the majority opinion, Mr. Wells is a former member of the Indiana Bar and a former judge of the Shelby County Court from 1977 until 1983. He was a newspaper reporter for the Indianapolis Star from 1965 until 1977 and he began practicing law in Indiana in 1977. On December 12, 1990, he was suspended from practice in Indiana for three years (*In re Wells*, 572 N.E.2d 1290 (Ind.1991)) (R. 52–59), and twice denied readmission. His application to take the Tennessee Bar Exam was denied in February 1995.

After leaving the bench in 1984, Mr. Wells opened a law practice. According to Mr. Wells, he began making unwanted sexual advances to male, criminal and civil, clients ranging in ages 16 to 24 because, Mr. Wells explained, he was overworked and his marriage was not working. Mr. Wells also displayed pornographic videos to two seventeen-year-old boys who had visited his law office. Mr. Wells informed this Committee's investigator that he was careful not to approach any male clients who were not "of legal age," that is, below the age of sixteen, by checking the individual's drivers' license. Mr. Wells estimated that he approached 10–20 young males and would touch them to see if they were interested in a sexual relationship with him. At the hearing before the Committee, Mr. Wells also explained that he approached his male clients because he "enjoyed the activity" (R. 967). Mr. Wells stated that he

> never used coercion, threats, intimidation [or] tried to talk anybody into anything. It was just a simple sexual pass, and I handled the cases for the individuals. [R. 968]

In 1987, Mr. Wells was arrested and charged with five counts of battery (R. 26–27). At the hearing before the Committee, Mr. Wells blamed his discovery on the fact that a former client with whom he had a sexual relationship offered to testify against him in order to obtain a lenient sentence following the former client's arrest for burglary (R. 958).[2] According to Mr. Wells, the local prosecutor feared that he, Mr. Wells, would be running for the Office of Prosecutor and used this information to investigate 150–200 of Mr. Wells' former clients. In a plea agreement, Mr. Wells admitted having sex with two of the clients and pled guilty to one count of battery (R. 899). The other four counts were dismissed.

Disciplinary proceedings against Mr. Wells were instituted in Indiana in 1987. According to Mr. Wells, he turned down a one-year suspension because he did not believe at the time that he had done anything wrong (R. 961). Neither his wife nor his two grown children appeared in his behalf in Indiana or before this Committee.

Mr. Wells sought reinstatement by the Indiana Supreme Court in 1994 (R. 60).[3] During the reinstatement hearing, Mr.

1. This dissent is by Committee Chairman Nettler, joined by Ms. Barnes.

2. Mr. Wells characterized his conduct as a "private wrong" as distinct from a public wrong, which, according to Mr. Wells, would involve a violation of the attorney-client privilege (R. 1025).

3. During the review of his reinstatement request, Mr. Wells wrote the Executive Director of the Disciplinary Commission of the Indiana Supreme Court and stated that "[t]here is no earthly way that I can simply state that such behavior [which led to his suspension] will not happen again, in a manner which would convince the Court that I can again be placed in a position of trust." (R. 212).

Wells admitted to ten incidents during the years 1985 to 1987, but stated that he understood that he now understood that his actions were wrong and that he had been receiving psychiatric counseling. The Indiana Supreme Court denied reinstatement (R. 82). The Court found that it was not convinced that Mr. Wells

> has a proper understanding of and attitude toward the standards that are imposed upon members of the bar and that he will conduct himself in conformity with such standards. [The Court further concluded] that he has failed to meet the requirements set forth in Admis. Disc. R. 23, Section 4(b) * * *. [R. 82].

In 1997, Mr. Wells again sought reinstatement with the Indiana Supreme Court, while his application for admission to the Bar was pending in the District of Columbia. In support of his reinstatement request, Mr. Wells submitted a "Report" by him entitled "The Sexual Revolution is over * * * at least for lawyers," in which he discussed the "trend" against attorney-client sexual contact, including the discipline of those "who merely talk sexual activity" with a client (R. 295–296). This report was used by Mr. Wells in an attempt to demonstrate that he was aware of the basis of his suspension in Indiana and of the consequences of his own actions. Mr. Wells also filed "a list of any potential derogatory statements by Byron C. Wells which may have lead to the Indiana Supreme Court's conclusion by any method, and explanation of the process involved in the hearing," in the belief that his denial of reinstatement was based on something other than the record before the Court (R. 314–322).

The Indiana Supreme Court again denied reinstatement (R. 860). The Supreme Court found that "[b]oth the petitioner's pleadings and presentation at hearing are permeated by suggestions that he has been wronged by the disciplinary process of this state and that his misconduct did not warrant a sanction as severe as a three-year period with the additional burden of convincing this Court of his fitness for readmission at the conclusion of this period" (R. 862). The Supreme Court went on to state that

> misconduct leading to petitioner's suspension was grave. He used his advantage, power and control to attempt to inappropriately incite sexual relations with young men, some of whom had come to the respondent to seek his professional assistance. * * * In the present case, our concerns about the sincerity of the petitioner's remorse and the integrity of his attitude towards and understanding of the standards imposed upon members of the bar, coupled with the severity of his misconduct, outweigh the evidence he presented concerning his rehabilitation and present fitness to practice law. [R. 862–863].

Following the action of the Indiana Supreme Court, this Committee conducted an investigation to determine whether Mr. Wells presently possesses good moral character and general fitness to practice law in the District of Columbia. *See In re Manville*, 494 A.2d 1289 (D.C.1985) ("*Manville I*"). The Committee had the benefit of the record before the Supreme Court of Indiana. Mr. Wells has also supplemented the record given the passage of time since this matter was first heard by the Committee.[4]

---

4. The supplemental filing shows that Mr. Wells has been the subject of two lawsuits for unpaid credit card bills for approximately $14,000.00 which remain unpaid. One of the lawsuits resulted in a judgment in 2000 and the other is scheduled for trial in August 2002. Mr. Wells also has debts in excess of

At the hearing before the Committee, Mr. Wells testified that he now understands that what he did was wrong because now he can separate his alternative lifestyle from his responsibility as an attorney (R. 970–972). In explaining his change in understanding to the Indiana Supreme Court, during the second reinstatement petition proceeding, Mr. Wells previously believed that

> if he had only asked a client to have sex, rather what he assumed was a subtle attempt by touching, then he would never have been in trouble with the disciplinary board and this Court. * * * He has rejected that contention, and now understands that although what may be legally permissible, may still be a moral violation and against the rules of this Court. [R. 220, emphasis added].

With regard to his inability to obtain reinstatement in Indiana, Mr. Wells also stated that he does not believe that he could ever obtain a license in Indiana because he has been placed on a higher level than other individuals, characterizing the Chief Justice's action as a "vendetta" (R. 1004). According to Mr. Wells, his reinstatement petitions were denied because the "Chief Justice of the Indiana Supreme Court had been rumored to have an alternative lifestyle and if he ruled in Wells' favor, it would appear that he was showing favoritism to one who had the same lifestyle as himself" (R. 900), or, in the alternative, it was because Mr. Wells had been a reporter for the same newspaper that had purportedly investigated the Chief Justice's lifestyle (R. 986–987). Mr. Wells did not provide the Committee with any evidence that supported his assertion that the Chief Justice of the Indiana Supreme Court had been investigated for having an "alternative lifestyle," including any alleged newspaper reports, or any other evidence which would provide a basis for Mr. Wells' bald assertions.

Mr. Wells had the burden of establishing by clear and convincing evidence that he currently possesses good moral character and general fitness to practice law in the District of Columbia. D.C.App. R. 46(d) and (e). The Court of Appeals has made it clear that, in circumstances such as those present here, a prior conviction of a serious crime is not an insurmountable obstacle to our finding "good moral character" under Rule 46(e). Instead, the Committee is obligated to examine an applicant's present moral character, and if we are sufficiently convinced that the applicant is rehabilitated, we should recommend that admission should be granted. *Manville I; In re Manville*, 538 A.2d 1128 (D.C.1988) ("*Manville II* "); *In re Sobin*, 649 A.2d 589 (D.C.1994). Moreover, " 'The more serious the misconduct, the greater the showing of rehabilitation that will be required.' " *In re Demos*, 564 A.2d 1147, 1149 (D.C.1989), quoting *In re Matthews*, 94 N.J. 59, 81, 462 A.2d 165, 176 (1983) (internal citation omitted) ("*Demos I* "), op. vacated, 564 A.2d 1155.

On this record, a minority of the Committee cannot agree with the Committee's majority conclusion that Mr. Wells is rehabilitated or that he possesses the character required of a member of the Bar. The standard of clear and convincing evidence is far more demanding than a mere preponderance of the evidence. The clear and convincing standard "requires evidence that will 'produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.' " *In re T.J.*, 666 A.2d 1, 16 n. 17 (D.C.1995), quoting *District of Columbia v. Hudson*, 404

---

$30,000.00 for medical bills from surgery in

1999, which are also unpaid.

A.2d 175, 179 n. 7 (D.C.1979) (internal citation omitted).

In the Committee's minority view, the record instead demonstrates a failure on Mr. Wells' part to accept full responsibility for his actions, troubling inconsistencies and contradictions between words and deeds, as well as the findings in Indiana that preceded us but are at variance with the position recommended by the Commission. Thus, I would recommend that Mr. Well's application be denied.

## DISCUSSION

*Manville I* requires us to consider eleven non-exclusive factors in deciding whether Mr. Wells has established his "full and complete rehabilitation." *Manville I,* 494 A.2d at 1295–96, quoting *Application of Davis,* 38 Ohio St.2d 273, 274, 313 N.E.2d 363 (1974). We do not engage in a mechanical weighing of these factors, but treat them as guides to decide whether "the duration and quality of [his] good behavior ... establish present good moral character." *In re Polin,* 630 A.2d 1140, 1141 (D.C.1993) ("*Polin II* "). The minority of the Committee would apply the facts of this matter to the *Manville* factors as follows:

A. *The nature and character of Mr. Wells' offenses; the number and duration of offenses.*

In assessing the nature and character of Mr. Wells' offenses, one has to consider the totality of his misconduct and not merely the specific count to which he pleaded guilty. The minority of the Committee agrees with the Indiana Supreme Court that Mr. Wells' conduct toward his young male clients was a grave offense. In his testimony before the Committee, Mr. Wells agreed with this conclusion. Thus, Mr. Wells willfully and repeatedly

breached a fiduciary duty owed to clients over an extended period of time. The number of clients affected and the period involved was significant. While this Court has never had occasion to consider an original proceeding in which such misconduct has been subject to discipline, it has reviewed reciprocal discipline matters that have involved some similar conduct. *See In Re Piatt,* 724 A.2d 1210 (D.C.1999) (public censure and unsupervised probation for one year for sexually harassing clients); *In re Goldsborough,* 654 A.2d 1285 (D.C.1995) (two-year suspension for sexual misconduct towards female clients, with reinstatement conditioned on proof of fitness). The Court has not opined as to how it would deal with such matters if they were before it in an original proceeding, but the Indiana Supreme Court found that the conduct constituted grave misconduct and in neither of the reciprocal discipline matters does it appear that any criminal proceedings against the attorney were ever instituted.

B. *Mr. Wells' age and maturity when the offenses were committed, and the social and historical context at the time.*

Mr. Wells was in his mid–40's at the time of his misconduct and had been a trial judge for seven years and a practicing attorney for three years. Thus, Mr. Wells was of sufficient age and maturity that he was well able to appreciate the wrongfulness of his conduct. His conduct cannot be explained as a youthful indiscretion. Indeed, Mr. Wells acknowledged that he committed the offenses, although his acknowledgment seems contradictory at times. For example, he continued to try and make distinctions between what he did and other violations of the disciplinary rules, describing his misconduct as a private wrong because it involved "private" relationships and characterizing other

breaches of attorney-client responsibilities as "public" wrongs in an apparent effort to downplay the seriousness of the misconduct. Thus, the social and historical context at the time of the offenses does not constitute an extenuating circumstance or otherwise suggest that the misconduct was aberrational. *See Manville II*, 538 A.2d at 1130–31 and 1134–35 (discussion of Brooks' application). Indeed, the issue in Indiana or before this committee is not whether Mr. Wells' lifestyle is inappropriate and there is no basis for judging Mr. Wells sexual orientation. The issue has always been Mr. Wells' conduct toward young clients and his attempts to justify that conduct and his continuous attempts to ascribe improper motives for the actions taken against him.

C. *The sufficiency of the punishment undergone and the restitution made.*

Upon his conviction for one count of battery, a misdemeanor, Mr. Wells participated in a diversion program, which he completed. Mr. Wells' probation may have been sufficient punishment to satisfy the community's interests in retribution and deterrence. However, Mr. Wells's attitude about the actions taken against him suggests that he may not fully understand where the blame lies in his situation. Perhaps more to the point, for it is indicative of his current attitude about his misconduct, Mr. Wells has continued to provide varying rationales for his inability to obtain reinstatement that focus on others rather than his own conduct. For example, Mr. Wells asserts that his inability to obtain reinstatement is not really based upon the Indiana Supreme Court's concern "about the sincerity of [his] * * * remorse and the integrity of his attitude towards and understanding of the standards im-

posed upon members of the bar," but because of personal issues regarding the Chief Justice of the Supreme Court and some personal animus he might be applying to Mr. Wells.

The foregoing facts in the record demonstrate that Mr. Wells has yet to meet squarely his personal responsibility for this misconduct. Thus, Mr. Wells' professed acknowledgment of his responsibility cannot be reconciled with his performance and other statements to date.

E. *The number of years that have elapsed since the last offense was committed, and the presence or absence of misconduct during that period.*

Assuming that the violations ceased in 1990, it has been twelve years since the last offense was committed. The record does not show any subsequent misconduct. However, the substantial length of time since Mr. Wells engaged in criminal misconduct is the only factor that militates in favor of his admission to the Bar.

F. *Mr. Wells' current attitude about his offenses (e.g., acceptance of responsibility for and renunciation of past wrongdoing and remorse) and related wrongdoing.*

While Mr. Wells blames himself for his misconduct, this blame seems tempered by other statements made by Mr. Wells during the Committee's investigation of his application. Mr. Wells does not really express remorse as much as he expresses disgust with a system that penalizes what he calls consensual conduct. In addition, as discussed earlier, Mr. Wells ascribes some personal animus toward the Chief Judge of the Indiana Supreme Court for the rejection of his reinstatement petitions.

G. *Mr. Wells' candor, sincerity and full disclosure in the filings and proceedings on character and fitness.*

The findings of the Indiana Supreme Court, at the time the record in this case was prepared, was both relatively recent and quite grave, and raised concerns about Mr. Wells'·character and fitness to practice law.[5] While I am mindful of the possibility that Mr. Wells may have been chastened and educated by the findings of the Indiana Supreme Court, the fact that Mr. Wells acknowledged that his conduct was wrong cannot be reconciled with Mr. Wells' continued failure to demonstrate *by performance* and words his complete acceptance of responsibility for his misconduct. Mr. Wells' inability [to] take full responsibility seems consistent with his current failure to take responsibility for large debts that he has incurred since the hearing on this application.

H. *Mr. Wells' constructive activities and accomplishments subsequent to his criminal conviction.*

Mr. Wells has compiled a record of community service. Mr. Wells' community service is laudable evidence of his rehabilitation, but this conduct was also reviewed by the Indiana Supreme Court and found not to warrant reinstatement. Nothing in the evidence introduced by Mr. Wells to the Committee, or in any supplemental materials submitted to the Committee, indicates that the prior community service has been built upon to warrant a different conclusion than that reached by the Indiana Supreme Court.

I. *The opinion of character witnesses about Mr. Wells'·moral fitness.*

·With his application, Mr. Wells submitted letters from ·many character references, which had been utilized in his petition for reinstatement to the Indiana Supreme Court. (R. 1125, 1136–1155). All spoke to his good character and recommended his admission to the Bar. While we give some credit to Mr. Wells' reference letters, and to those who spoke on his behalf, we also note that this same evidence and testimony was presented to the Indiana Supreme Court.

### DISSENTING CONCLUSION

Byron Wells has accumulated some accomplishments since he engaged in his misconduct. Although relatively long ago, that misconduct continues to reflect adversely on Mr. Wells'.character and fitness to practice law, because it involved serious breaches of fiduciary duties and obligations. Mr. Wells has made efforts toward rehabilitation: He participated in community service activities and he has made favorable impressions on certain people who know of his misconduct.

·However, we are unable to join in the Majority's recommendation of Mr. Wells' admission to the District of Columbia Bar, since we conclude that Mr. Wells has not sustained his high burden of proof. The Indiana Supreme Court denied Mr. Wells' petitions for reinstatement application to the Indiana Bar, not because of his convictions, but rather because of his lack of candor and his "inability to recognize his dereliction of a moral duty." (R. 89). While Mr. Wells now professes to understand the gravity of his misconduct, we are

---

**5.** There were also inconsistencies in Mr. Wells's testimony about his relationship with his wife at the time he petitioned for reinstatement which did not square with representations made by others to the Committee's investigator. Aside from Mr. Wells' self-serving statements regarding his children's support of him there is nothing in this record or the record of the Indiana Supreme Court to support the assertion relied upon by the majority.

unable to agree with the majority of the Committee that there exists "a firm belief or conviction" of Mr. Wells' complete rehabilitation and candor. We therefore respectfully dissent from the Majority's recommendation that he be admitted.

Respectfully submitted,
/s/ Richard B. Nettler
Richard B. Nettler
Chairman
Committee on Admissions
500 Indiana Avenue NW, Room 4200
Washington, DC 20001
202/879-2710

